693 A.2d 1259

IN THE MATTER OF THE APPLICATION OF HOLY NAME
HOSPITAL FOR A CERTIFICATE OF NEED.

Superior Court of New Jersey
Appellate Division

Argued May 21, 1997—Decided May 28, 1997.

Before Judges SHEBELL, BAIME and P.G. LEVY.

*Theodosia A. Tamborlane,* argued the cause for appellant (*Ms. Tamborlane,* attorney and on the brief; *Rebecca L. Tamborlane,* on the brief).

*Mary F. Rubinstein,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Rubinstein,* on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

Holy Name Hospital (Holy Name) appeals from the denial of its application for a certificate of need (CON) to expand its home health services into Hudson County. Administrative Law Judge

(ALJ) Edith Klinger sustained the findings of the State Health Planning Board (SHPB) that the potential increase in the need for home health services could be satisfied by existing providers and that granting Holy Name's application could adversely affect the cost efficient delivery of home health care in the county. Holy Name contends that (1) the proceedings were procedurally defective because the SHPB did not issue a separate written decision as required by regulation, and (2) the ALJ's findings are not supported by sufficient credible evidence and her legal conclusion is arbitrary and capricious. We reject these arguments.

## I.

Under the Health Care Facilities Planning Act (*N.J.S.A.* 26:2H–1 to –18.78), no health care provider may construct new facilities or expand existing ones or initiate new services unless a certificate of need has been granted by the Commissioner of Health. *N.J.S.A.* 26:2H–7; *see also N.J.A.C.* 8:33–3.1. In *In re Certificate of Need Granted to the Harborage*, 300 *N.J.Super.* 363, 693 *A.2d* 133 (App.Div.1997), we described the statutory and regulatory framework within which decisions pertaining to applications for certificates of need are made. We need not tread upon ground so ably covered by Judge Michels in that decision. Suffice it to say, no CON may be issued unless the applicant establishes that there is a need for "health care in the area to be served," and that granting the application "will not have an adverse economic or financial impact on the delivery of health care services in the region or [s]tatewide." *N.J.S.A.* 26:2H–8. The factors that must be considered include: (1) the availability of facilities or services which may serve as alternatives or substitutions, (2) the need for special equipment or special services in the area, (3) the potential economies that could be accomplished by the operation of joint central services, (4) the adequacy of financial resources and the potential for future revenues, (5) the availability of sufficient personnel in the applicable professional disciplines, and (6) other relevant factors as may be identified by way of regulation. *Ibid.*

The administrative process is triggered by a "call" from the Department of Health and Senior Services, inviting the submission of CON applications. *N.J.A.C.* 8:33–4.1(a), (b). Once the Department determines that the applications are complete, *N.J.A.C.* 8:33–4.5, –4.9, –4.10, they are forwarded to a Local Advisory Board (LAB) with jurisdiction over the applicable geographic area. *N.J.S.A.* 26:2H–5.9(b), –10; *N.J.A.C.* 8:33–4.1, –4.12. If twenty-five percent or more of the quorum of voting members approve the application, it is forwarded to the SHPB. *N.J.S.A.* 26:2H–10.1(a)(1). In turn, if twenty-five percent or more of the voting members of SHPB approve the application, it is forwarded to the Commissioner for his review. *N.J.S.A.* 26:2H–10.1(a)(2); *N.J.A.C.* 8:33–4.14(b). If the applicant does not obtain the approval of the requisite percentage of the LAB's or the SHPB's voting members, it may seek a hearing by the Office of Administrative Law (OAL). *N.J.A.C.* 8:33–4.14. Upon approval of the application by an ALJ, the matter is then forwarded to either the SHPB or the Commissioner, as appropriate, for review. *N.J.A.C.* 8:33–4.14(c). However, if the ALJ sustains the LAB's or the SHPB's denial of the application, the decision is deemed a final agency determination which may be directly appealed to this court. *R.* 2:2–3(a)(2).

It is against this somewhat abstruse statutory and regulatory backdrop that we briefly summarize the salient facts. In 1991, the Department conducted a home health care survey in an attempt to determine whether there was a need for additional services for medical patients. Under its methodology, the Department sought to find whether there existed a "service gap," *i.e.*, the difference between services provided and services needed coupled with demonstrated access problems for patients in a given service area. *See N.J.A.C.* 8:33L–2.4(a)(3). Utilizing 1991 data, the Department concluded that between 147,550 and 313,110 visits to home health agencies by medicare beneficiaries would be needed in Hudson County by 1994. The data indicated that in 1991, 88,757 actual visits were provided in the county. The Department thus anticipated that a gap of between 58,803 and 224,353 visits would exist in 1994 unless existing providers expanded their services or new

providers became available. Although the statewide percentage of individuals sixty-five years or older was 13.5% and in Hudson County was only 12.7%, the Department considered the potential service gap sufficiently significant to issue a call for CON applications.

Holy Name, a 361–bed hospital located in Bergen County, submitted an application pursuant to the call. Specifically, Holy Name sought to expand its existing Bergen County home health care program by providing services in neighboring Hudson County. In its application, Holy Name emphasized that it was forced to refer its Hudson County patients to other home health providers. Noting that the percentage of its patients residing in Hudson County had increased over the years, Holy Name indicated that it wished to provide continuity of patient care.

Holy Name's application was forwarded to the LAB having jurisdiction in Bergen and Hudson counties. Evidence was presented indicating that Holy Name had long provided valuable services to the homeless and to battered women in Bergen County. Additional evidence was submitted in which it was contended that if its application were granted, Holy Name would provide a broad array of home health services, including maternal and child care, pediatric, hospice and rehabilitative services, and physical therapy.

A consortium of existing Hudson County home health providers recommended against granting Holy Name's application. The consortium noted that there were six home health providers in the county and that these agencies provided adequate consumer choice and access. Specific access problems alleged by the other applicants for home health services were rebutted by the consortium. Moreover, the consortium presented data indicating that allowing additional providers in the county would reduce the number of visits provided by the existing agencies, thereby increasing the cost per visit. The consortium noted that while Holy Name projected a per visit cost of $63.44, the average cost per visit in the county was $61. The consortium argued that there was no

unmet need for home health services in Hudson County, and that granting Holy Name's application would result in costly duplicative services.

The LAB voted to approve Holy Name's application. The application was thus forwarded to the SHPB for its review. We need not recount at length the evidence presented to the SHPB. It is enough to say that the proofs were conflicting both with respect to whether existing Hudson County home health providers could satisfy the anticipated service gap and whether cost per visits would be increased if Holy Name were granted a CON. In their comments immediately preceding their votes, SHPB members emphasized the lower percentage of medicare patients residing in Hudson County compared to the state average, the strong likelihood that any future need for home health services could be fulfilled by existing providers, and the possibility that granting Holy Name's application might adversely affect the financial integrity of existing agencies. The SHPB approved a motion presented by the chairperson essentially encompassing these conclusions, and denied Holy Name's request for a CON.

The matter was then referred to the OAL as a contested case. Both Holy Name and the SHPB filed motions for summary decision. In her written decision granting the SHPB's motion, the ALJ concluded that Holy Name failed to satisfy its burden of proving that an "unmet need" for home health care existed in Hudson County or that residents did not have appropriate access to such services. The ALJ found ample support in the record for the SHPB's finding that approval of Holy Name's application could adversely affect the financial stability of existing providers and add to the cost of home health services.

## II.

We first address Holy Name's argument that the administrative proceedings were flawed because the SHPB failed to issue a separate written determination articulating its reasons, as re-

quired by *N.J.A.C.* 8:33–4.13(c). That regulation provides in pertinent part as follows:

> The State Health Planning Board shall furnish written decisions to the Commissioner which provide the explicit basis for any recommendations made by the Board on certificate of need applications.... These written decisions may take the form of minutes of the State Health Planning Board.
>
> [*N.J.A.C.* 8:33–4.13(c).]

Although the regulation expressly states that the minutes of the SHPB's meeting may serve as the agency's decision, Holy Name argues that the failure to provide a separate written determination renders the proceedings *per se* unreasonable.

█ Preliminarily, we note that this is an appeal from a final determination of an administrative law judge. Although the SHPB's decision is a part of the record, ALJ Klinger had the ultimate authority to deny Holy Name's application. As appellate judges, our principal duty is to review her written decision to determine whether the conclusion reached was arbitrary or capricious. *See Public Advocate Dep't v. Public Utils. Bd.*, 189 *N.J.Super.* 491, 507, 460 *A.2d* 1057 (App.Div.1983). So posited, it is arguable that we would be obliged to affirm the ALJ's decision if it met the applicable test, even if the prior administrative proceedings were technically flawed by a procedural error having no capacity to lead to an unjust result. *But see Holy Name Hosp. v. Health Care Admin. Bd.*, 258 *N.J.Super.* 411, 417, 609 *A.2d* 1305 (App.Div.1992) (stating that judges need the Commissioner's findings and conclusions to determine if the decision is reasonable). As we will note later in our opinion, we are satisfied that the ALJ's conclusions concerning the SHPB's recommended denial of Holy Name's application reasonably could have been reached on the evidence contained in the record.

█ We nevertheless decide whether the SHPB's decision comported with the controlling regulation because we are told that the issue is a recurrent one and that several administrative law judges have concluded that a separate written decision is necessary in all cases. The guiding principles are well-settled. The traditional role of administrative agencies acting in an adjudicative

capacity is to review evidence, make findings of fact, and exercise statutorily granted discretion in reaching conclusions. *See In. re Controlled Cable Corp.*, 95 *N.J.* 473, 484, 472 *A.2d* 130 (1984); *Kramer v. Board of Adjustment, Sea Girt*, 45 *N.J.* 268, 280, 212 *A.2d* 153 (1965); *In re Plainfield–Union Water Co.*, 11 *N.J.* 382, 395–96, 94 *A.2d* 673 (1953); *McFeely v. Board of Pension Comm'rs*, 1 *N.J.* 212, 216, 62 *A.2d* 686 (1948). Fact-finding "is a basic requirement imposed on agencies that act in a quasi-judicial capacity." *In re Issuance of a Permit*, 120 *N.J.* 164, 172, 576 *A.2d* 784 (1990). An agency must engage in fact-finding to the extent required by statute or regulation and provide notice of those facts to all interested parties and any reviewing tribunal for the salutary purpose of setting forth "the basis on which the final decision was reached." *In re Howard Sav. Inst.*, 32 *N.J.* 29, 52, 159 *A.2d* 113 (1960). Our Supreme Court has repeatedly observed that "[t]his requirement is 'far from a technicality and is a matter of substance.'" *In re Issuance of a Permit*, 120 *N.J.* at 173, 576 *A.2d* 784 (quoting *New Jersey Bell Tel. Co. v. Communications Workers of America*, 5 *N.J.* 354, 375, 75 *A.2d* 721 (1950)). We, too, have emphasized the importance of carefully articulated administrative findings. *See, e.g., Public Advocate Dep't v. Public Utils. Bd.*, 189 *N.J.Super.* at 500, 460 *A.2d* 1057; *St. Vincent's Hosp. v. Finley*, 154 *N.J.Super.* 24, 29–33, 380 *A.2d* 1152 (App.Div. 1977). In a slightly different context, the Administrative Procedure Act in *N.J.S.A.* 52:14B–10(d) requires "separately stated" findings of fact and conclusions of law. "[F]act-finding ensures that agencies act within the scope of their delegated authority." *In re Issuance of Permit*, 120 *N.J.* at 173, 576 *A.2d* 784. It also facilitates judicial review. *Ibid.* (citing *State v. Atley*, 157 *N.J.Super.* 157, 163, 384 *A.2d* 851 (App.Div.1978)). Appellate courts "cannot exercise their duty of review unless they are advised of the considerations underlying" the administrative determination. *In re Plainfield–Union Water Co.*, 11 *N.J.* at 396, 94 *A.2d* 673.

Because the SHPB performs a quasi-judicial function, the preferable practice, at least in complex cases, is to provide the

Commissioner with a separate written decision containing particu-
larized fact-findings and conclusions of law. However, *N.J.A.C.*
8:33–4.13(c) does not require a separate written decision, but
instead permits the SHPB to articulate its findings and reasons in
the minutes of its meetings. Further, a transcript of the SHPB's
oral decision, if it meets the requisites we have described, would
seem to serve the same purpose as a separate written decision.
Indeed, judicial decisions often are recited in a transcript without
further explication in the form of a separate written determina-
tion. There is no regulatory requirement for a separate written
determination. Either the minutes of the SHPB's meeting or the
transcript may serve as a written decision for the purpose of the
regulation. As long as the minutes or the transcript contain a
particularized explication and articulation of the SHPB's reasons
for either granting or denying approval, it should suffice, and the
administrative law judge must accept it as the written decision of
the agency.

We emphasize, however, that the SHPB must act as a
unitary administrative agency. Although comments from individ-
ual SHPB members are part of the record and may serve to
elucidate the considerations that were weighed by the agency,
neither the OAL, nor the Commissioner nor a reviewing court
should be required to "count heads" to determine whether a
consensus was reached. The agency's decision is not merely the
sum of the comments made by its individual members. To
reiterate, the SHPB must, as an administrative body, state its
reasons with particularity, but it may perform this vital function
by setting forth its findings and conclusions in the properly
adopted minutes of its meeting or in a motion or resolution
contained in the transcript of the proceedings.

Applying these principles, we conclude that the tran-
script of SHPB's meeting coupled with its minutes satisfied the
regulation's requirement that a "written decision[ ]" be furnished
to the Commissioner. *N.J.A.C.* 8:33–4.13(c). We also find that
the bare-boned motion of the chairperson, together with the

comments of the SHPB members immediately preceding the vote, were *marginally* adequate to apprise the Commissioner, the litigants and the reviewing court of the agency's reasons for denying Holy Name's application. We have underscored the word "marginally" because we expect that the SHPB will provide more particularized explications of its reasons in future cases. It is to be noted that, unlike the Commissioner, the SHPB is composed principally of laypersons.[1] We nevertheless anticipate that, with the guidance provided by this opinion and the assistance of legal counsel when necessary, the decisional qualities we described in *Holy Name Hospital v. Health Care Administrative Board*, 258 *N.J.Super.* at 417–19, 609 *A.*2d 1305, and in *In re Valley Hospital*, 240 *N.J.Super.* 301, 308–09, 573 *A.*2d 203 (App.Div.1990), *certif. denied*, 126 *N.J.* 318, 598 *A.*2d 879 (1991), and reiterated in *In re Arnold Walter Nursing Home*, 277 *N.J.Super.* 472, 480–81, 649 *A.*2d 1319 (App.Div.1994), will mark the decisions of the SHPB.

While the findings made by the SHPB, considered in the light of the principles we have cited, are not nearly so clear, full and well organized as one might reasonably expect, we will "not impede the administrative process and delay final disposition unless such is absolutely necessary to insure a just and proper review." *In re Howard Sav. Inst.*, 32 *N.J.* at 53, 159 *A.*2d 113. Our Supreme Court has said under similar circumstances, where an administrative agency's articulation of the basis for its decision was less than precise, that "[i]f ... we and the interested parties can and do understand fully the meaning of the [agency's] decision and the reasons for it," there is no basis "to remand for fuller and clearer findings and later reconsideration." *Ibid.* To order a remand in such a situation would amount to no more than "marching the king's men up the hill and then marching them down again." *City*

---

[1] Members of the SHPB are appointed by the Governor. Although the Commissioner and other public health officials serve as ex officio members, the voting members consist of "consumers of health care services" and other laypersons. *N.J.S.A.* 26:2H–5.7.

*of Yonkers v. United States,* 320 *U.S.* 685, 694, 64 *S.Ct.* 327, 332, 88 *L.Ed.* 400, 405 (1944) (Frankfurter, J., dissenting).

The essential thrust of the SHPB's decision is clear—given the lower percentage of medicare patients in Hudson County compared to the state average, the lack of demonstrable proof that residents cannot obtain access to home health care, the existence of providers in the county that can satisfy any perceived service gap, and the potential for destabilizing existing providers by adding Holy Name to the current mix, the CON was denied. ALJ Klinger concluded that the SHPB's denial of Holy Name's application was reasonable under the circumstances. We next consider whether the ALJ's findings and conclusions reasonably could have been reached on the record before her.

## III.

We first cite the controlling principles. It is firmly settled that arbitrary and capricious action taken by an administrative agency must be overturned. *Worthington v. Fauver,* 88 *N.J.* 183, 204, 440 *A.2d* 1128 (1982). In fact, an appellate court is not only privileged, but required to set aside arbitrary and capricious agency action. *Drake v. Department of Human Servs.,* 186 *N.J.Super.* 532, 536, 453 *A.2d* 254 (App.Div.1982). The burden is on the party challenging the validity of an agency's decision to demonstrate that the action was arbitrary, capricious or contrary to a legislative purpose. *Medical Soc'y of New Jersey v. Department of Law & Pub. Safety,* 120 *N.J.* 18, 25, 575 *A.2d* 1348 (1990); *Smith v. Ricci,* 89 *N.J.* 514, 525, 446 *A.2d* 501, *appeal dismissed,* 459 *U.S.* 962, 103 *S.Ct.* 286, 74 *L.Ed.2d* 272 (1982). A "strong presumption of reasonableness" must be accorded the agency's exercise of its statutorily delegated duties. *City of Newark v. Natural Resource Council,* 82 *N.J.* 530, 539, 414 *A.2d* 1304, *cert. denied,* 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.2d* 245 (1980). This presumption is even stronger when the agency has delegated discretion to determine the technical and special procedures to accomplish its task. *Id.* at 540, 414 *A.2d* 1304. When there is

room for two courses of action, an administrative decision will not be deemed arbitrary and capricious if exercised honestly and the course ultimately chosen is a reasonable one. *Worthington v. Fauver,* 88 *N.J.* at 204–05, 440 *A.*2d 1128; *Bayshore Sewerage Co. v. Department of Envtl. Protection,* 122 *N.J.Super.* 184, 199, 299 *A.*2d 751 (Ch.Div.1973), *aff'd o.b.,* 131 *N.J.Super.* 37, 328 *A.*2d 246 (App.Div.1974). Conversely, "a determination predicated on unsupported findings is the essence of arbitrary and capricious action." *In re Boardwalk Regency Corp. for a Casino License,* 180 *N.J.Super.* 324, 334, 434 *A.*2d 1111 (App.Div.1981), *modified on other grounds,* 90 *N.J.* 361, 447 *A.*2d 1335 (1982).

In reviewing an agency decision, we must survey the record to determine if sufficient credible evidence supported that determination. *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988). Even if we might have chosen a different course, the agency's decision must be affirmed if supported by the record. *Id.* at 588, 538 *A.*2d 794. We are not free to substitute our judgment as to the wisdom of a particular agency action so long as it is statutorily authorized and not otherwise defective as arbitrary and capricious. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562–63, 384 *A.*2d 795 (1978).

As we noted, the SHPB found that existing providers could meet the home health needs of Hudson County. The ALJ similarly found that Holy Name failed to satisfy its burden of demonstrating an unmet need. *See N.J.A.C.* 8:33L–2.4(a)(3). Our examination of the record discloses substantial credible evidence supporting these conclusions. The record shows that the population of Hudson County is relatively stable and the percentage of medicare patients is less than the statewide average. At the time of Holy Name's application, six home health providers were in operation. Two additional "special needs" providers were added in the course of the proceedings.[2] A representative of the LAB

---

2 "Special needs populations" are defined at *N.J.A.C.* 8:33L–1.2 as "those patients with diagnoses which continuously require comprehensive skilled nurs-

testified that, according to existing home health providers, there were no problems in the county with consumer choice or access for services, and no lengthy waiting lists of patients requiring care. Moreover, as noted by Holy Name in its application, it was primarily concerned with providing home health services to its outpatients and discharged patients. We cannot say that the findings made pertaining to the lack of unmet need were so wide of the mark that a mistake must have been made.

■ We reject Holy Name's contention that the SHPB improperly failed to apply the prioritization criteria set forth in *N.J.A.C.* 8:33L–2.4(b). These criteria are to be applied when there is more than one CON application for a region with a documented access problem. *Ibid.; see also In re Arnold Walter Nursing Home,* 277 *N.J.Super.* at 480–81, 649 *A.2d* 1319; *In re Valley Hosp.,* 240 *N.J.Super.* at 310–11, 573 *A.2d* 203. With the addition of two "special needs" providers, the SHPB, and the ALJ, could reasonably have concluded that no such problem existed in Hudson County, and, hence, there was no need to prioritize applicants under the regulation.

We also find support in the record for the SHPB's and the ALJ's conclusion that approval of Holy Name's application could have an adverse economic effect on existing providers. *N.J.S.A.* 26:2H–8 states that a CON should not be granted if it will have "an adverse economic or financial impact on the delivery of health care services in the region." The consortium of existing providers presented evidence that the average cost per visit proposed by Holy Name was higher than the county-wide average. Additional evidence indicated that the duplication of services might increase, rather than decrease, home health costs. *See N.J.S.A.* 26:2H–8(c). Moreover, individual members of the SHPB expressed concern

---

ing care including treatment modalities such as TPN and chemotherapy. For example, these can include pediatric, HIV-infected or medically indigent patients." Applicants seeking to serve special needs populations must comply with the additional requirements specified at *N.J.A.C.* 8:33L–2.4(a)(3)(i).

that the pool of trained staff might be diminished, thus increasing personnel costs. *See N.J.S.A.* 26:2H–8(e).

We conclude that ALJ Klinger's acceptance of the SHPB's findings and conclusions was not arbitrary or capricious. Pursuant to *N.J.A.C.* 8:33–4.14(c)(2), the role of the ALJ is to "review the reasonableness of the [SHPB's] reasons for denial ... based on the documenting evidence that was presented to the [SHPB], [and] other documentation may not be introduced during the course of the hearing." ALJ Klinger found evidential support in the record for each of the SHPB's conclusions. We perceive no sound basis to disturb the ALJ's decision.

Affirmed.