778 A.2d 473

UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JER-
SEY—UNIVERSITY HOSPITAL, APPELLANT, v. CHRISTINE
GRANT, COMMISSIONER, DEPARTMENT OF HEALTH AND
SENIOR SERVICES, AND MICHELE K. GUHL, COMMISSION-
ER, DEPARTMENT OF HUMAN SERVICES, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 2, 2001—Decided June 7, 2001.

164

Before Judges WALLACE, Jr., LINTNER and PARRILLO.

*Joseph Lubertazzi, Jr.* argued the cause for appellant (*McCarter & English*, attorneys; *Richard J. Webb* and *Mr. Lubertazzi*, of counsel; *Paul E. DelloRusso* and *Lisa M. DeRose*, on the brief)

*Howard Z. Myerowitz*, Deputy Attorney General, argued the cause for respondents (*John J. Farmer, Jr.*, Attorney General, attorney; *Nancy Kaplan*, Assistant Attorney General, of counsel; *Eileen C. Stokley*, Deputy Attorney General, on the brief).

*Brian M. Foley* argued the cause for intervenor Cathedral Health Services, Inc.

*Richard R. Width* argued the cause for intervenors Trinitas Hospital and St. Joseph's Hospital and Medical Center (*Lindabury, McCormick & Estabrook*, attorneys; *Mr. Width*, on the brief).

*Michael E. Petrella* argued the cause for intervenor Jersey City Medical Center (*Lowenstein Sandler*, attorneys; *Zulima V. Farber*, on the brief; *Lowenstein Sandler* also join in the briefs filed by respondents and by intervenor Cathedral Health Services, Inc.).

The opinion of the court was delivered by

PARRILLO, J.S.C. (temporarily assigned).

This is an appeal by University of Medicine and Dentistry of New Jersey University Hospital (UMDNJ), the largest provider of charity care in New Jersey, from a final determination by the Department of Health and Senior Services (DHSS) that decreased its FY2000 charity care subsidy by $9,215,646 from its FY1999 allocation. UMDNJ attributes error in the DHSS's calculation to the use of wrong charity care charges data and cost reports as well as the failure to take into account its "nominal charge provider" status when valuing its documented charity care. We agree only with the latter and therefore remand for valuation of UMDNJ's documented charity care at the same rate paid by the Medicaid program as is statutorily required.

In 1991, New Jersey enacted the Health Care Cost Reduction Act (Act), which, in relevant part, subsidizes hospitals that serve a disproportionate number of low-income patients who are unable to pay their hospital bills. *N.J.S.A.* 26:2H–18.51 to –18.70. Charity care subsidies are distributed from the Health Care Subsidy Fund, which the DHSS administers. *N.J.S.A.* 26:2H–18.58.

The DHSS uses a standard statutory formula to determine the amount of the subsidy an eligible hospital may receive. *N.J.S.A.* 26:2H–18.59e. Eligible hospitals, however, do not necessarily receive a full "reimbursement" covering all of their actual charity care expenses; rather, a hospital receives only its proportionate share of the total subsidy funded by the Legislature for that year. *Ibid.* For FY2000, the year involved in this case, the Legislature appropriated $320,000,000 for charity care subsidy payments. *N.J.S.A.* 26:2H–18.59(e). UMDNJ was one of forty-six eligible hospitals that sought a share of the FY2000 charity subsidy.

The statutory distribution formula requires a determination of how much charity care an eligible hospital has provided, valued not at its usual and customary charges but rather on the amount Medicaid would pay for such services ("documented charity care"). *N.J.S.A.* 26:2H–18.59e(a)(1). To this end, hospitals seeking charity care subsidies are "required to submit all claims for charity

care cost reimbursement ... to the department in a manner and time frame specified by the Commissioner of Health and Senior Services...." *N.J.S.A.* 26:2H–18.59(b)(3). The information to be submitted concerns services rendered to charity care patients in the most recent calendar year, in this case 1998. *N.J.S.A.* 26:2H–18.59e(a)(1).

Pursuant to the Act, the DHSS contracted with the UNISYS corporation (UNISYS) to process charity care claims and price them at the appropriate Medicaid rate. UNISYS developed the Essential Health Services Claims Pricing System Manual (ECPS Manual), which sets forth the manner and time frame for hospitals submitting subsidy claims.

The ECPS Manual encourages hospitals to submit claims for charity care on a monthly basis according to a schedule published by the DHSS. If a claim is submitted in a timely manner, UNISYS then issues a "remittance advice" to the hospital "by the 5th working day after the monthly adjudication cycle date." The ECPS Manual also provides that "[i]f a submitter fails to receive the requested remittance tape(s) or if there are problems with the remittance tape(s), it is the responsibility of the submitter to notify UNISYS in writing within fourteen days from the remittance date." Furthermore, "[t]he individual provider is ultimately responsible for the accuracy and validity of every ECPS claim submitted for payment." *See Northwest Covenant Medical Center v. Fishman*, 167 *N.J.* 123, 129, 770 *A.*2d 233 (2001).

The actual dollar amount of charity care provided by the hospital must be "verified in the department's most recent charity care audit...." *N.J.S.A.* 26:2H–18.59e(a)(1) ("... documented charity care shall be equal to the audited Medicaid-priced amounts for the most recent calendar year"). In other words, the DHSS must perform charity care audits of all charity care claims submitted by eligible hospitals for the reporting year.

Hospitals record the value of the charity care they provide at their usual and customary charges, but, as noted, the charity care subsidy is based on the amount Medicaid would pay for such

services. *N.J.S.A.* 26:2H–18.59e(a)(1). Therefore, the initial value must be converted or "priced" to the Medicaid value to determine ultimately the "documented charity care" for each eligible hospital.

Prior to July 1998, the auditing and pricing processes were separate functions. Hospitals created quarterly lists of charity care claims audited by Horizon Blue Cross Blue Shield (HBCBS). They would also submit a sampling of their claims to UNISYS, which created a pricing ratio (reflecting the ratio of the Medicaid rate to the actual billing rate for the claims) and used it to set the Medicaid value of the charity care claims and, hence, the hospital's "documented charity care" by multiplying the pricing ratio by the audited list of claims.

In July 1998, after ample notice to all hospitals, the DHSS combined the auditing and valuation steps into a unified, streamlined process. Hospitals were no longer required to create audit lists of charity care claims and UNISYS no longer calculated a pricing ratio to be applied against the audited claims. Instead, hospitals were to submit information directly to UNISYS, which would process every claim, issue quarterly charity care audit lists, and price the value of charity care directly from the claims approved and accepted.

Because of the mid-year change in methodology, the "pricing" or conversion of charity care claims in CY1998 (i.e., the reporting year for FY2000), to reflect the Medicaid rates, was done through a combination of actual Medicaid pricing and the application of "pay-to-charge" ratios used to estimate Medicaid payment amounts. In other words, the "documented charity care" used for the FY2000 charity care subsidy payments was based on the following mixture: the first and second quarter 1998 HBCBS audit lists multiplied by first and second quarter 1998 UNISYS pricing ratios, added to the third and fourth quarter 1998 figures audited and priced through the UNISYS system.

To this basic figure, other calculations are applied to determine eligibility for, and amount of, any subsidy. The "profitability factor" reduces the hospital's "documented charity care" if the

hospital's operating margin is above the statewide median. *N.J.S.A.* 26:2H–18.59e(a)(3). Also considered is the "payer mix factor," determined by how much of the hospital revenues come from private payers. *N.J.S.A.* 26:2H–18.59e(a)(6). A hospital with a factor equal to or less than the statewide target would not receive a charity care subsidy. *N.J.S.A.* 26:2H–18.59e(a)(7).

## I.

Application of this complicated formula to UMDNJ resulted in a FY2000 charity care subsidy of $51,768,050 based on total "documented charity care" charges of $80,132,805, priced through the UNISYS system, for CY1998. UMDNJ's subsidy was $9,215,646 less than its FY1999 allocation. Its "documented charity care" charges were also approximately $13,000,000 less than the amount recorded as "billed" on UNISYS's remittance advices for the same time period and $2,581,899 less than the $82,714,704 figure produced by HBCBS, which apparently continued to perform audits for the remainder of CY1998 although no longer required to do so. UMDNJ cites these discrepancies to support its claim of error in the calculation of its "documented charity care" charges. Other than this, however, UMDNJ does not demonstrate that the data used by UNISYS was incorrect or improperly recorded.

Our role in reviewing administrative agency decisions is limited. *In re Taylor,* 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999); *Brady v. Board of Review,* 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997). We will not upset the determination of an administrative agency absent a showing it was arbitrary, capricious or unreasonable, lacked fair support in the evidence, or violated legislative policies. *In re Musick,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996); *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963); *Application of Holy Name Hospital,* 301 *N.J.Super.* 282, 295, 693 *A.*2d 1259 (App.Div.1997); *Matter of Visiting Nurse Association,* 302 *N.J.Super.* 85, 94–95, 694 *A.*2d 1038 (App.Div.1997). Further, decisions of administrative agencies carry a presumption of rea-

sonableness. *See City of Newark v. Natural Resource Council*, 82 *N.J.* 530, 539, 414 *A.*2d 1304, *cert. denied*, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980). We may not vacate an agency's determination because of doubts as to its wisdom or because the record may support more than one result. *See generally Henry v. Rahway State Prison*, 81 *N.J.* 571, 579–580, 410 *A.*2d 686 (1980).

> Furthermore, it is not our function to substitute our independent judgment for that of an administrative body ... where there may exist a mere difference of opinion concerning the evidential persuasiveness of the relevant proofs. As a reviewing court, we will not weigh the evidence, determine the credibility of witnesses, draw inferences and conclusions from the evidence, or resolve conflicts therein.
>
> [*De Vitis v. New Jersey Racing Comm'n*, 202 *N.J.Super.* 484, 489–490, 495 *A.*2d 457 (App.Div.), *certif. denied*, 102 *N.J.* 337, 508 *A.*2d 213 (1985) (internal citations omitted).]

Here, as noted, for the second half of CY1998, the DHSS used UNISYS's figures derived from claims priced through the UNISYS system and not the HBCBS audit lists. This was entirely proper. The DHSS was not obligated to use the figures determined by HBCBS's audit summary sheets. Rather, the statutory requirement is simply that an audit be made before the documented charity care figure is established. *N.J.S.A.* 26:2H–18.59e(a)(1) ("... documented charity care shall be equal to the *audited* Medicaid-priced amounts for the most recent calendar year") (emphasis added).

The clear purpose of the legislation is to ensure the DHSS bases the subsidy on *verified* figures from the hospitals that show how much charity care each hospital provided. It is equally clear, that in implementing this mandate, the Commissioner has broad discretion. *See N.J.S.A.* 26:2H–18.55(b) (the Commissioner may "contract with a private claims administrator or processor for the purpose of processing hospital claims for charity care pursuant to this act"); *see also N.J.S.A.* 26:2H–18.59(b)(3) (the Commissioner establishes the manner and time frame within which hospitals must submit their claims). In this case, UNISYS was chosen as the DHSS's private fiscal agent for the review, processing, pricing,

and payment of charity care claims to providers. *N.J.A.C.* 10:49–8.1.

There was no abuse of the Commissioner's discretion in doing so. Nor was there any abuse of that discretion for the DHSS to streamline the audit process by eliminating the requirement, after the second quarter of 1998, that hospitals create an audit list for charity care claims, substituting instead the quarterly audit lists generated for each hospital by UNISYS. Hospitals remained under the obligation to provide timely and accurate information to the DHSS which they satisfied, commencing July 1998, by submitting their data directly to UNISYS.

Starting in July 1998, "pricing" the value of charity care was done by UNISYS on the basis of all claims submitted by the hospitals through that system. UNISYS reviews all claims for approval, denial, or further review. *N.J.A.C.* 10:49–8.2(a)(1). It issues monthly remittance advices to the hospitals that provide the status and identifying details on every claim submitted. *Ibid.* The providers then have fourteen days to notify UNISYS in writing of any dispute. UNISYS statements are then transmitted to the DHSS, in this case by UMDNJ, and each page shows claims "billed," "allowed," and "priced."

Despite being the source of the very figures it now claims to be incorrect and having had access to the UNISYS's statements for quite some time, UMDNJ has yet to identify any error in UNISYS's calculation of $80,132,805 in total "documented charity care" charges or in UNISYS's denial of any of its charity care claims. Nor does UMDNJ dispute the underlying "documented charity care" charges data it submitted directly to UNISYS or that UNISYS properly reviewed and substantiated same.

Simply put, UMDNJ's challenge that DHSS used understated "charity care charges" data lacks any specificity or proof and relies exclusively on the discrepancies mentioned above. These, however, are easily explained. The so-called $13,000,000 gap merely reflects the difference between the amount "billed" by the provider and the amount "allowed" or approved by UNISYS after

processing these claims and eliminating various errors in the reporting. As noted, UMDNJ makes no assertion that any of its charity care claims were improperly denied. The approximately $2,000,000 differential in UMDNJ's total charity care figure for 1998 produced by UNISYS and HBCBS was explained by the DHSS as follows:

[Your] letter does not take into account the fact that documented charity care at charges for the second half of calendar year 1998 is derived from claims priced through the Unisys system, plus claims submitted pursuant to the extension period that ended August 20, 1999. This could potentially account for differences between the Blue Cross audit list charges and the documented charity care charges reflected in the Department's subsidy allocation schedule.

We consider this explanation plausible. In any event, UMDNJ fails to show that the figures UNISYS used for the second half of CY1998 were incorrect. For reasons unexplained, UMDNJ did not timely object to the accuracy of such figures after its review of the remittance advices issued by UNISYS on a monthly basis. To date, UMDNJ offers no proof demonstrating that UNISYS's tally was wrong despite having a method at its disposal for identifying any such errors. We therefore find no error in the DHSS's use of UNISYS data rather than HBCBS audit lists when calculating UMDNJ's charity care subsidy.

## II.

We also find no merit in UMDNJ's argument that the DHSS improperly used its FY1998 SHARE forms figures while using CY1997 figures for other hospitals. Unlike its first challenge that was directed to the base figure, the claim here refers to the adjustment in the total "documented charity care" amount based on the hospital's profitability and payer mix factors. UMDNJ claims that because the federal government reduced the levels at which Medicaid reimbursed for GME (Graduate Medical Education), use of its FY1998 instead of CY1997 forms resulted in a lesser charity care subsidy.

SHARE cost reporting forms are standard forms used by hospitals to report their costs to Medicaid and Medicare. The

DHSS uses SHARE forms to calculate elements of the charity care allocation methodology, such as the hospital's profitability factor and the payer mix factor. In December 1998, UMDNJ submitted to the DHSS the cost report to be used in the FY2000 charity care calculations. UMDNJ, which operates on a state fiscal year basis, submitted as its 1997 cost report one that covered the fiscal year ending on June 30, 1998. Notably, UMDNJ has never submitted calendar year cost reports.

There are several reasons why UMDNJ's argument, that its FY1998 forms should not have been used to develop profitability and payer mix for the FY2000 charity care subsidy allocation formula, fails. First, UMDNJ itself submitted its FY1998 cost data to the DHSS under cover of a letter dated December 29, 1998 that had identified it as the "1997 Cost Report." Second, as the Commissioner reasonably concluded, this being the most recent hospital cost report available for the calculation of the FY2000 charity care subsidy, its use by the DHSS was consistent with the statutory mandate requiring that the "documented charity care" equal the audited Medicaid-priced amount "for the most recent calendar year." *N.J.S.A.* 26:2H–18.59e(a)(1).

Last, there is no proof that use of the prior year's data would have been more favorable to UMDNJ or, on the other hand, that use of CY1997 forms for all other hospitals prejudiced UMDNJ. As noted, SHARE forms are used, in part, to calculate the hospital's profitability factor, which reduces its "documented charity care" only if its operating margin is above the statewide median. Here, UMDNJ's operating margin was below the statewide median and, therefore, its "documented charity care" was not reduced by the profitability factor.

SHARE forms are also used to calculate the payer mix factor, which is determined by how much of hospital revenues come from private payers. A hospital with a factor equal to or less than the statewide target would be ineligible to receive a charity care subsidy. Obviously, because UMDNJ received a charity care

subsidy for FY2000, use of the payer mix factor was neither disqualifying nor otherwise prejudicial.

UMDNJ submitted its FY1998 figures in a format it identified as its "1997 Cost Report" and has failed to show any resultant prejudice. We therefore decline to direct that the calculation for FY2000 be changed for this reason.

## III.

While we discern no problem with any of the underlying data used, we find error in pricing the Medicaid value of UMDNJ's "documented charity care" without regard to its "nominal charge provider" status. This status has implications for the methodology used to establish a provider's charity care outpatient ratio. In this case, disregard of that status wrongly undervalued the amount of that care priced at the Medicaid rate.

The Act requires valuing charity care claims, whether for outpatient or inpatient services, at the Medicaid rate *N.J.S.A.* 26:2H–18.59e(a)(1) (". . . at the same rate paid to that hospital by the Medicaid program"); *see also N.J.A.C.* 10:52–12.2(a). For outpatient hospital services, the final rate of Medicaid reimbursement is based on the lesser of the reasonable cost or the customary charges (LCC). *N.J.A.C.* 10:52–4.3(a)(1): 42 *C.F.R.* § 413.13(b)(1). Exempted from this LLC principle, however, are "[p]ublic providers that furnish services free of charge or at a nominal charge." 42 *C.F.R.* § 413.13(c)(1)(ii).

The DHSS acknowledges that UMDNJ is a "nominal charge provider," which means that Medicaid recognizes that it charges charity care patients less than its costs for outpatient services. In fact, it appears that UMDNJ was the only hospital in the State that qualified for such status in FY2000. As noted, under the Medicaid program, this status exempts the provider from the LLC outpatient reimbursement methodology, in favor of a higher rate—the actual outpatient cost to charge ratio. In other words, because of its nominal charge status, UMDNJ qualifies for more

favorable rates at its annual final settlements of Medicaid rates for outpatient services.

UMDNJ requested the DHSS to take the final Medicaid settlement rates into account in calculating its charity care outpatient award for FY2000 thereby producing a higher pricing ratio and a greater share. The DHSS rejected using the actual outpatient cost-to-charge ratio essentially because UMDNJ had not requested the status earlier but had indicated a willingness to discuss employing this approach in the future.

On appeal, the DHSS argues that "nominal charge provider" status is conferred retroactively, during the Medicaid final settlement process and as such, under *N.J.A.C.* 10:52–13.4(b)(3),[1] cannot be considered in determining the value of charity care claims. Such a construction, however, contravenes the express direction in the enabling legislation that charity care be calculated at the hospital-specific Medicaid rate, a rate set by Medicaid by taking "nominal charge provider" status into account. To the extent the regulation suggests otherwise, it must give way to the clear legislative mandate. *Richard's Auto City, Inc. v. Director, Division of Taxation,* 140 *N.J.* 523, 530, 659 *A.*2d 1360 (1995); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978); *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 563, 362 *A.*2d 13 (1976).

We see no inconsistency, however, because we do not construe *N.J.A.C.* 10:52–13.4(b)(3) as does the DHSS. The regulation addresses only the charity care subsidy process and the manner in which the DHSS sets the charity care rate. It does not speak to the predicate process by which Medicaid determines its reimbursement rate to providers for Medicaid patient care. The

---

[1] *N.J.A.C.* 10:52–13.4(b)(3) provides, in pertinent part, as follows:

All charity care accounts shall be valued at the Medicaid rate as follows:
    3. Disproportionate share adjustments and final rate settlements for the service period shall not be taken into account for the recognition of charity care costs.

process by which Medicaid applies its own regulations to set the Medicaid rate is separate and distinct from that wherein the DHSS applies that rate to calculate the value of "documented charity care." Obviously, the "final rate settlements" mentioned in *N.J.A.C.* 10:52–13.4(b)(3) refer not to the Medicaid process but rather to adjustments on review and appeal of rates set by the DHSS. We therefore do not read the regulation to prohibit the DHSS from taking a provider's "nominal charge provider" status into account.

We surmise the DHSS's true objection stems more out of concern for convenience than for the legal propriety of any retroactive adjustment to account for "nominal charge provider" status. Yet this is hardly a legitimate ground to deny that which may be justly due and owing UMDNJ. *See Northwest Covenant Medical Center v. Fishman, supra,* 167 *N.J.* at 152–53, 770 *A.2d* 233 (Stein, J. concurring).

In any event, there is an established mechanism to account for a provider's change in status and to accomplish any readjustments, if necessary, at the end of the reporting period. Medicaid makes interim payments during the year to hospitals on an estimated cost basis (using the previous year's figures) with the understanding that at the end of the year, the payments will be adjusted once the actual Medicaid costs are determined. 42 *C.F.R.* § 413.64(b). A retroactive adjustment then is made at the end of the year to bring the interim payments into agreement with the reimbursable amount payable to the provider. 42 *C.F.R.* § 413.64(f)(1).

We also do not refrain from remanding to recalculate the charity care distribution simply because of the effect on the other participating hospitals. *See Northwest Covenant Medical Center v. Fishman, supra.* As Justice Stein said in concurrence in that case:

It is self evident that the amounts recouped from those hospitals would have been substantially less if the Departments had corrected the charity-care allocations in March 1997 when the error was discovered. More to the point, the recoupment from those named hospitals and the remaining sixty-one hospitals would have served the salutary purpose of returning from those hospitals in the

aggregate more than $1.9 million incorrectly and unnecessarily paid to them and justly due and owing to St. Clare's.

[167 *N.J.* at 153, 770 *A.*2d 233].

*See also Alexian Brothers Hospital, et al. v. State of New Jersey, Department of Health,* 242 *N.J.Super.* 411, 419, 577 *A.*2d 164 (App.Div.1989).

In other words, whatever financial difficulties may befall those who had benefitted from the DHSS's mistake simply do not excuse the necessity to abide by the statutory and regulatory scheme that in this instance requires the DHSS to afford UMDNJ its "nominal charge provider" status.

## IV.

Our study of the record persuades us to conclude that the DHSS arbitrarily declined to consider UMDNJ's "nominal charge provider" status in calculating its FY2000 charity care subsidy but, in all other respects, acted properly. We therefore direct the DHSS to recalculate and reallocate the FY2000 charity care subsidy to take into account UMDNJ's "nominal charge provider" status.

## V.

Reversed in part and remanded to the DHSS for corrective action consistent with this opinion.