**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1781-17T2
      A-1933-17T2

CHRISTIAN HEALTH CARE
CENTER,

  Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF HEALTH,

  Respondent-Respondent.

_____

CARRIER CLINIC,

  Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF HEALTH,

  Respondent-Respondent.

_____

Argued October 3, 2019 – Decided December 12, 2019

Before Judges Fisher, Accurso and Rose.

On appeal from the New Jersey Department of Health, Docket No. FR 17 0529-16-22.

Bruce Willard Clark argued the cause for appellants Christian Health Care Center and Carrier Clinic (Clark Michie LLP, attorneys; Bruce Willard Clark and Christopher J. Michie, on the briefs).

Tanjika Nicole Williams-Parks, Deputy Attorney General, argued the cause for respondent New Jersey Department of Health (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Tanjika Nicole Williams-Parks, on the briefs).

Edwin F. Chociey argued the cause for respondents Universal Health Services, Inc., Hampton Behavioral Health Center and Summit Oaks Hospital (Riker Danzig Scherer Hyland & Perretti LLP, attorneys; Edwin F. Chociey and Glenn A. Clark, of counsel and on the briefs).

PER CURIAM

Christian Health Care Center and Carrier Clinic – the operators of two not-for-profit health care facilities – appeal a final decision of the Commissioner of the New Jersey Department of Health that granted Universal Health Services, Inc.'s applications for certificates of need to add beds to existing psychiatric facilities and to open new facilities. Christian and Carrier argue the final decision was arbitrary because the findings failed to adequately explain the need for additional psychiatric beds, take into consideration the adverse impact on

2

A-1781-17T2

existing Christian and Carrier facilities, and failed to require Universal to provide information on integral criteria. We agree and reverse.

I

The Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 to -26, designates the Department of Health to oversee the administration of private and public healthcare institutions "of the highest quality, of demonstrated need, efficiently provided and accessible at a reasonable cost," in order to protect and promote the health of New Jersey residents. N.J.S.A. 26:2H-1. Under the Act, a health care facility must apply for a certificate of need before constructing or expanding a facility. N.J.S.A. 26:2H-7. Applications for certificates of need may not be entertained "until the Commissioner invites such applications by a general public notice," In re Certificate of Need Application of Arnold Walter Nursing Home, 277 N.J. Super. 472, 476 (App. Div. 1994) (citing N.J.A.C. 8:33-4.1(a)), or issues special calls for applications for an identified need, In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 417 (2008).

The Department will not grant a certificate of need unless the proposal provides "required health care in the area to be served, can be economically accomplished and maintained, will not have an adverse economic or financial

impact on the delivery of health care services in the region or Statewide, and will contribute to the orderly development of adequate and effective health care services." N.J.S.A. 26:2H-8. Specifically, the Department must consider:

> (a) the availability of facilities or services which may serve as alternatives or substitutes, (b) the need for special equipment and services in the area, (c) the possible economies and improvement in services to be anticipated from the operation of joint central services, (d) the adequacy of financial resources and sources of present and future revenues, (e) the availability of sufficient manpower in the several professional disciplines, and (f) such other factors as may be established by regulation.
>
> [Ibid.; see also N.J.A.C. 8:33-4.9(a)(1)-(5); N.J.A.C. 8:33-4.10(b).]

In considering whether the Department has exceeded its authority or acted arbitrarily in approving an application, we are guided by Virtua-West, where the Court remanded because the Commissioner failed to discuss the impact on urban hospitals likely to be affected. 194 N.J. at 434. The Act defined the protection of urban hospitals as one of its legislative objectives and, therefore, required the Commissioner to examine whether approving a certificate of need would negatively affect those hospitals. Id. at 434-35; N.J.S.A. 26:2H-6.1(h). In determining that the Commissioner "did not analyze, in any meaningful way," whether the grant would have "an adverse impact on the region's urban

A-1781-17T2

hospitals," the Court found that omission to constitute "a critical failing in a proceeding that has, as one of its pillars, avoidance of negative impacts on the delivery of health care services in the region." Virtua-West, 194 N.J. at 436. The Court emphasized that its role was not to reexamine the strength of the application, but to search the final agency decision for arbitrariness:

> As far as her decision reveals, the Commissioner uncritically accepted Virtua's position without examining and explaining her response to the positions advanced by the objectors. Virtua contends that petitioners' concerns are speculative. That may prove to be true, but on this record we cannot be sure. It may be that there was a basis for her to reach her conclusion to do so, but her decision gives little comfort that the required analysis took place.
>
> [Ibid.]

In Arnold Walter Nursing Home, the Department scored the applications on a point system similar to that used here and denied an application because the applicant scored one point less for failing to provide documentation showing a "need of the magnitude" for the type of bed. 277 N.J. Super. at 478. We held that the one-point difference in the criteria without a proper explanation was arbitrary; we were also critical because the Commissioner's decision was "one of mechanics rather than substance." Id. at 482. We have found arbitrary other unexplained or mechanical determinations. See In re Valley Hosp., 240 N.J.

5

Super. 301, 305 (App. Div. 1990); In re Bloomingdale Convalescent Ctr., 233 N.J. Super. 46, 54-55 (App. Div. 1989). With this understanding of the court's role in such a controversy, we turn to the agency determinations in question.

II

The record reveals that Carrier is a not-for-profit health care facility in Somerset County that specializes in psychiatric and substance abuse addiction treatment. The facility includes a 281-bed inpatient psychiatric hospital, a 32-bed detoxification and rehabilitation center, and a 78-bed adolescent residential facility. Christian owns and operates the Ramapo Ridge Psychiatric Hospital in Bergen County that includes a not-for-profit 58-bed facility offering inpatient and outpatient care; it also possesses an existing authorization from the Department to add twenty more psychiatric beds. Carrier Clinic and Ramapo Ridge receive referrals from many parts of New Jersey as well referrals from sources outside the State.

After finding in January 2015 that there was no need for additional psychiatric beds, the Department found in February 2017 "an increasing need for more adult acute care psychiatric beds" and established a need of forty beds per 100,000 adults. The Commissioner invited certificate of need applications by May 1, 2017; the call notice expressed a determined need for an additional

864 psychiatric beds across fourteen counties. The Department's "guidance document" advised applicants to respond to all components, impressing on them, in particular, a need to "[i]dentify all other institutions in the service area(s)" and a need to "[d]iscuss the anticipated impact of this project on these other institutions."

The Department received thirty applications, including four from Universal, which owns and manages Summit Oaks Hospital and Hampton Behavioral Health Center branches in New Jersey. Universal applied for approval of: (1) a new 120-bed Summit Oaks facility in Passaic County; (2) the addition of forty-eight beds to an existing Summit Oaks facility in Union County; (3) a new 120-bed Hampton facility in Monmouth County; and (4) the addition of forty-eight beds to an existing Hampton facility in Burlington County.

Universal's proposed Passaic County facility is a subject of these appeals due to its proximity to and impact on Carrier's and Christian's facilities. With respect to that proposed facility, on June 12, 2017, the Department asked Universal to provide additional information to show that "[t]he approval will not have an adverse economic or financial impact on the delivery of health care services in the region or statewide[.]" Universal responded that:

Metrics available from The Joint Commission and CMS show that [Universal] facilities provide effective health care services. For example, using various rating scales that measure severity, patients at [Universal] facilities see[] improvements in Behavior and Symptom Identification, Brief Psychiatric, Geriatric Psychotic Dependency, and Geriatric Depression. 95% of [Universal] facilities are at or above the national average on measures like Restraint Duration, Discharge Continuing Care Plan completed, and Continuing Care Plan sent on to the next provider. In 2015, 87% of [Universal] facilities met or exceeded the national average on Joint Commission Inpatient Psychiatric Measures; 70% of [Universal] facilities exceeded 95% whereas only 43% of facilities nationwide hit that level. [Universal] establishes benchmarks for restraint and seclusion, patient and staff injury, medication errors and falls.

Upon review, the Department "propose[d] to award" to Universal on all four applications, "the full complement of its requested beds[.]" The Department scored all criteria "to ensure that all applicable statutory and regulatory criteria were taken into account when evaluating each application[.]" Scoring was divided into five mandatory categories (based on statutory and regulatory criteria) and three optional categories (based on the special considerations identified in the call). The Department determined that every application would receive a minimum score of eight with respect to the second mandatory criteria – impact on nearby facilities – with the possibility of up to

two additional points if applicants provided letters of support. The minimum

score was based on the Department's determination that there was a need:

> for a significant number of additional adult acute
> psychiatric beds in specific counties. Because the need
> for additional beds was so great, Department staff
> determined that the award of those additional beds to
> the applicants would not have an adverse economic
> impact on the delivery of services in the region or
> statewide and would improve the orderly development
> of adequate and effective health care.

Universal received ten points in this category on all its applications. The

Department awarded the additional two points because Universal included a

letter of support from Princeton House Behavioral Health, which it claimed was

a competing facility despite its location in Mercer County.

In October 2017, the State Health Planning Board met to consider the

applications. Christian objected to the application for Summit Oaks in Passaic

County; its chief executive officer expressed concern that the application for a

new 120-bed facility "will most certainly have a material negative impact on

[Ramapo Ridge's] occupancy level and a decrease on [Ramapo Ridge's]

efficiencies and [] financial health" because, although Ramapo Ridge was in

Bergen County, it is near Passaic County and receives patients from that area.

He also noted that the only supporting letter was from the distant Princeton

House. When asked if the Board considered the effect on Ramapo Ridge, the

Department's Director stated that "we didn't pay attention to the impact on other providers because the need was so great that it didn't appear that it would have a significant impact on anybody." In response to the same question, the Board's Chair said, "I think you only have to talk to the hospitals about their emergency rooms to know that the bed need isn't being met." One Board member added that "the applicant did indicate that certainly the statistics of the county indicate that even with Ramapo, that these [needs] are not being sufficiently met by a fairly large degree, and I felt that the needs are going to go up[.]" The Board recommended approval of Universal's applications, which were in fact approved in November 2017.

## III

In appealing, Carrier and Christian argue that the Department: (a) failed to explain its factual basis for determining that forty psychiatric beds were needed per 100,000 adults or adequately respond to the assertion that it skewed whatever factual analysis it undertook by failing to account for pre-approved but not-yet-implemented beds; (b) failed to adequately consider or address the impact Universal's proposals would have on existing facilities or the availability of sufficient manpower to staff these proposed facilities; and (c) mistakenly

A-1781-17T2

accepted Universal's applications despite Universal's failure to address all the required elements of such an application.

In reviewing these arguments, we must give substantial deference to the agency's specialized or technical expertise, Virtua-West, 194 N.J. at 422, and we will not disturb agency actions or omissions unless the agency acted arbitrarily or unreasonably, failed to follow the law, or made determinations lacking support from relevant factors. In re Herrmann, 192 N.J. 19, 28 (2007); Bergen Pines Cty. Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 477 (1984). In reviewing a final decision, we expect that the administrative agency will "state the basis of [the] decision with clarity; and, with sufficiency, to articulate the factual determinations and legal standards that inform the action taken." Arnold Walter Nursing Home, 277 N.J. Super. at 479; Holy Name Hosp. v. N.J. Health Care Admin. Bd., 258 N.J. Super. 411, 415-16 (App. Div. 1992). The requirement that an agency provide interested parties with the reasoning behind its decision-making is "far from a technicality"; it is "a matter of substance." In re Issuance of a Permit, 120 N.J. 164, 173 (1990) (quoting N.J. Bell Tel. Co. v. Commc'ns Workers of Am., 5 N.J. 354, 375 (1950)). In the final analysis, we cannot properly review a case "in the absence of a particularized and detailed articulation of the Commissioner's assessment of the salient features of each

application, how the various applications compare to each other, and how each serves or fails to serve public health needs as expressed by the Legislature and in effecting regulations." Arnold Walter Nursing Home, 277 N.J. Super. at 483; Holy Name Hosp., 301 N.J. Super. 282, 292 (App. Div. 1997).

A

We turn first to an argument both Christian and Carrier pose about the Department's methodology for determining a need for psychiatric beds. Christian and Carrier argue that in ascertaining a need, the Department "inexplicably excluded inventory of already approved psychiatric beds," providing as an example that Ramapo Ridge holds outstanding authorization from the Department to add twenty more psychiatric beds to its facility. In responding to this argument, the Department doesn't dispute that these beds were excluded from its calculations, only that it "could not count beds that have not been implemented." This is an insufficient response. While inclusion of the unimplemented beds would not enlighten as to the number of beds actually in use, that figure would be relevant to determining what additional need beyond those in use was required throughout the State. By the same token, Christian and Carrier argue that the Department didn't factor in the existing inventory of psychiatric beds at certain private hospitals, citing as an example the apparent

12

disregard of the 150 drug-addiction beds operated by American Addiction Centers in Ringwood.

Christian and Carrier also rightfully question how the Department went from cancelling, in January 2015, a call for applications for certificates of need because "there was no indication of a present need for additional beds and services for this population," to suddenly, two years later, finding a need of an additional forty beds per 100,000 adults. Besides the inexplicable failure to count either beds that had already been authorized but not implemented or the availability of private beds, the Department also acknowledged in its call notice the significant variance between its two methodologies for calculating need, one which provided a range between only eighteen to twenty beds per 100,000 adults, and the other forty to sixty beds per 100,000 adults. The Department appears to have discounted the former and opted for the latter's lower end – without explanation – by simply declaring that it "has established a bed need of 40 adult psychiatric beds per 100,000 adults." At a public hearing, the Department could do no better than to explain this conclusion by baldly asserting "that the 40 beds per [one-hundred] thousand is a coalescing. There were some [calculations] that were higher than that, so we think that that 40 is good, <u>but you never know</u>" (emphasis added).

A-1781-17T2

Considering that even now the Department can provide no explanation of the decision not to incorporate in its factual analysis the existence of unimplemented beds or the availability of certain private psychiatric beds, or to otherwise explain its decision to assume that forty beds per 100,000 adults was appropriate – because that number was at the bottom of the range of the higher calculation without explaining the rejection of the methodology which projected a much lower need – poses grave questions about the reasonableness of its factual determination.  The Supreme Court has held that such a decision must be based on a "meaningful" analysis, In re Virtua-West, 194 N.J. at 436; see also Holy Name Hosp., 301 N.J. Super. at 292.  On this record, we must conclude the Department's determination of a need was unreasonable and arbitrary.

B

We reverse as well because of the Department's error in accepting Universal's applications despite Universal's failure to address the potential adverse economic or financial impact of its proposed project on existing facilities.  In response to that contention, the Department argues that it addressed the impact on nearby facilities and determined that, because the need level was so great, the operation of existing facilities would not be impacted.  This assumption that there would be no particular impact because the statewide need

was so great rests on a determination that was not shown to be based on the actual facts. Even if we could find in this record a reason for the conclusion that there was a great statewide need for additional psychiatric beds, we reject the argument that no further evidence of an impact was required.

In simply drawing such a conclusion, the Department mistakenly strayed from the Act's requirements and conveyed an ultimate opinion without relying on adequate factual support from the record. See Valley Hosp., 240 N.J. Super. at 308-09. Indeed, the Commissioner attempted to sweep most of the statutory requirements into the following single sentence:

> I also find that the [Board] sufficiently reviewed the potential impact on services, and that the applicant has demonstrated that the proposed project can be economically accomplished and maintained, will not have an adverse economic or financial impact on the delivery of health services in the region or statewide, and will continue the orderly development of adequate and effective health care services.

That is insufficient. The Department is required to base its findings on "the necessary facts" together with an "expla[nation] [of] its reasoning"; "[i]n other words, it is obliged '. . . to tell us why'" it drew its conclusion. Valley Hosp., 240 N.J. Super. at 306 (quoting Drake v. Human Services Dept., 186 N.J. Super. 532, 538 (App. Div. 1982)). The type of findings that will commend our deference are those which, at a most basic level, "show how and why the

15

Commissioner made up h[er] mind the way [s]he did." Id. at 307 (quoting In re Application of Howard Sav. Inst., 32 N.J. 29, 52-53 (1960)).

We acknowledge that administrative agencies have a certain level of expertise and are owed deference when exercising that expertise. Arnold Walter Nursing Home, 277 N.J. Super. at 483. And, when rendering decisions, including those before us, the agency need not regurgitate all data in the record used to support that decision. Valley Hosp., 240 N.J. Super. at 307. But the agency must produce a decision that clarifies, "without question or doubt[,] what facts and factors led to the ultimate conclusions reached." Ibid. That didn't happen here. We have not been provided with an understanding of the "information the Commissioner thought significant and worthy of reliance" in support of the decision. Holy Name Hosp., 258 N.J. Super. at 417. We have only been presented with generalities and have been left to guess whether the Commissioner properly analyzed Universal's applications. See Virtua-West, 194 N.J. at 436.

C

We also agree that the Department erred by failing to reject Universal's applications because of Universal's failure to provide a response to the established criteria. Although an applicant must provide "compelling evidence"

16

to support the statutory criteria, <u>Matter of Visiting Nurse Ass'n of Sussex Cty., Inc.</u>, 302 N.J. Super. 85, 97 (App. Div. 1997), the duty to ensure proposed facilities will adhere to the criteria "lies squarely with the Commissioner." <u>Virtua-West</u>, 194 N.J. at 436.

Although applicants were directed by the Department to provide an explanation of the statutory criteria, the record clearly establishes that Universal failed to adequately explain its position on at least three important criteria. For example, as for its application to build a psychiatric hospital in Passaic County, Universal was obligated to provide – per the Department's "guidance document" – information about "[t]he availability of facilities or services which may serve as alternatives or substitutes[.]" Universal responded that "[t]here are two acute care facilities in Morris . . ., one in Passaic (St. Joseph's Hospital and Medical Center) and one in Sussex . . .," and then asserted that the "combined occupancy rates for current beds are above 80% <u>in Morris and Sussex Counties</u>" (emphasis added), without demonstrating what this would do to the availability of facilities or services <u>in Passaic County</u>.

In addressing the "availability of sufficient manpower in the several professional disciplines," Universal provided only a general statement that it is "currently not experiencing difficulties in maintaining staffing levels at its

A-1781-17T2

[other] facilities," as well as its unsupported assurances that it does "not expect[] difficulties in filling the positions" needed to staff the proposed facility.

And in opining on whether the approval will "have an adverse economic or financial impact on the delivery of health care services in the region or statewide," Universal provided only a general discussion of the record of its parent company that seems based on its performance outside the State.

We also note that Universal was obligated to provide letters of support from competing facilities, yet provided only one letter from Princeton House in Mercer County, a significant distance from Christian's facility in Bergen County.

It is abundantly clear from a close examination of the record, in light of the issues raised, that Universal's applications are deficient. The Department mistakenly saw no problem because it viewed the statewide need for adult psychiatric beds as being so great. This was acknowledged by the Department Director when he said at a public hearing at which such objections were voiced, that the Department "didn't pay attention to the impact on other providers[.]"

\* \* \*

For these reasons, we conclude that the Department's determinations that there was a need for additional adult psychiatric beds – and its approval of Universal's applications – cannot stand.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1781-17T2