**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1472-21

IN THE MATTER OF THE DENIAL
OF A DISPENSARY PERMIT
ENDORSEMENT TO GUADCO2
LLC TO OPERATE AN
ALTERNATIVE TREATMENT
CENTER PURSUANT TO THE 2019
REQUEST FOR APPLICATION
PROCESS.

_____

Argued November 8, 2023 – Decided December 19, 2023

Before Judges Whipple, Mayer and Enright.

On appeal from the New Jersey Cannabis Regulatory Commission.

John W. Bartlett argued the cause for appellant GuadCo2 LLC (Murphy Orlando LLC, attorneys; John W. Bartlett, Jason F. Orlando, and Tyler Newman, on the briefs).

Jacqueline R. D'Alessandro, Deputy Attorney General, argued the cause for respondent New Jersey Cannabis Regulatory Commission (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, on the brief).

PER CURIAM

Appellant GuadCo2 LLC (GuadCo) appeals from a December 7, 2021 final agency decision issued by respondent New Jersey Cannabis Regulatory Commission (CRC) denying its application for a medicinal marijuana dispensary permit to operate an alternative treatment center (ATC) pursuant to the 2019 Request for Applications (RFA). GuadCo's appeal challenges the CRC's scoring of its application regarding the criteria designed to ensure diversity in issuing medicinal cannabis permits, known as Criterion Seven, Measure Three. Specifically, GuadCo contends the score it received under Criterion Seven, Measure Three, addressing women-owned businesses, was arbitrary, capricious, and unreasonable. We affirm.

We incorporate the background regarding the CRC's issuance of dispensary permits to operate ATCs set forth in the back-to-back companion cannabis permit cases presented to the panel on October 11, 2023. See I/M/O Denial of the Dispensary Permit Endorsement for AP NJ Health, LLC, No. A-0783-21 (App. Div. Dec. 8, 2023); I/M/O Denial of Dispensary Permit Endorsement for Green Leaf Medical of New Jersey, LLC, No. A-0943-21 (App. Div. Dec. 8, 2023); I/M/O Denial of Dispensary Permit Endorsement for NJ

Holistic Health, LLC, No. A-1326-21 (App. Div. Dec. 8, 2023).[1]  In our consolidated opinion on these back-to-back cannabis permit cases, we described, in detail, the process adopted by the CRC for reviewing permit applications to operate ATCs.

The RFA established an August 21, 2019 deadline for applicants seeking a dispensary permit.  The RFA declared the deadline to be "absolute," noting that late filed applications would not be reviewed.  The RFA also required all materials relevant to the review of an application to be provided by the deadline.

The CRC assigned teams to review each dispensary permit application. Each team, consisting of selection committee members with relevant experience or expertise in a specific field, reviewed and scored a specific portion of the application.

Relevant here, Reviewer Three scored Criterion Seven, Measure Three regarding an applicant's status as a minority-owned business enterprise (MBE), women owned business enterprise (WBE), or veteran owned business (VOB).

---

[1]  While Rule 1:36-3 generally precludes reference to unpublished opinions, we may refer to an unpublished decision for case history.  See Animal Prot. League of N.J. v. N.J. Dep't of Env't Prot., 423 N.J. Super. 549, 556 n.2 (App. Div. 2011) (citing Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2011)).

According to the CRC, Reviewer Three had expertise in business development and minority, women, and veteran-owned businesses. Consistent with the directions provided with the RFA and the CRC's scoring instructions, Reviewer Three awarded points to applicants under Criterion Seven, Measure Three.

Reviewer Three awarded a full thirty-point score under Criterion Seven, Measure Three to applicants providing a MBE/WBE certification from the Department of Treasury's Division of Revenue. Those applicants lacking a Department of Treasury certification could receive a partial credit score based on the strength of the evidence supporting the applicant's claim to be an MBE, WBE, or VOB. To receive partial credit, an applicant needed to demonstrate it would "meet the criteria [for certification] once generating revenue."

In awarding a partial credit score, Reviewer Three "was instructed to use their expertise to determine appropriate partial credit, based on the strength of the evidence provided in the application and their knowledge of the statutes and rules governing the . . . certification process[]." Additionally, in evaluating Criterion Seven, Measure Three, Reviewer Three was directed to consider only those persons or entities with an ownership interest of five percent or greater as listed in Part A, Question 20 of the RFA.

After the applications were scored, the CRC audited the scores for statistical consistency and reviewed the scores for compliance with the scoring and the RFA instructions. The CRC also reviewed the scoresheets for accuracy and interviewed the scorers. The CRC's analysis confirmed "the overall scores, scores delivered by specific reviewers, and [whether] scores from each team were consistent and distributed in accordance with a normal and expected statistical curve."

In a November 10, 2021 memorandum entitled "General Responses to Debrief Questions," the CRC explained the scoring process. The memorandum addressed questions raised by applicants, including concerns about the scoring of Criterion Seven, Measure Three. The memorandum advised that applicants providing a Department of Treasury certification received the full thirty points allotted for this measure. In the absence of a Department of Treasury certification, a partial credit score up to twenty-five points was awarded if the applicant provided evidence that it would otherwise meet the MBE, WBE, or VOB certification requirements "once generating revenue."

Additionally, the memorandum provided examples of circumstances where an applicant received only a partial credit score, such as: stating the applicant possessed or would apply for certifications from entities other than the

5

Department of Treasury, Division of Revenue[2]; submitting information responsive to Part B of the application that contradicted the ownership information provided in Part A of the application or was inconsistent with certification requirements; providing certifications for a related entity rather than the current applicant; presenting a certification as its own where the certification was actually registered to a different entity; stating it did not meet certification requirements but would otherwise attempt to promote inclusivity and diversity in the future; or failing to submit sufficient information to determine whether it could qualify for a certification in the future. The memorandum further explained Reviewer Three's scores complied with the scoring instructions and were "consistent across applicants, consistent with the scoring instructions and RFA instructions, and reflective of the reviewer utilizing their unique expertise to evaluate the information submitted by applicants."

GuadCo timely filed an application for a dispensary permit in the Central region of the State. As of the filing deadline, GuadCo lacked a Department of

---

[2] The CRC previously advised that only "certifications from the . . . Department of the Treasury's Division of Revenue ad Enterprise Services" would be considered in support of WBE status and declined to accept similar certifications from third-party organizations.

Treasury certification as a WBE. Because it lacked that certification, in the alternative, GuadCo stated it would "meet the criteria [for certification] once generating revenue."

In its response to Part A of the RFA, GuadCo attached a copy of its corporate formation document, entitled Limited Liability Company Agreement of GuadCo2 LLC (LLC Agreement). GuadCo also attached copies of three subscription agreements.

GuadCo's application, specifically its response to Part A, Question 20, identified the following female owners who purportedly owned a majority of the company: Patricia Baldwin Gregory, GuadCo's president and general counsel; Joan Guadagnino, GuadCo's chief operating officer and manager; and Sheila Baldwin-Cohen, an investor. In answering Criterion Seven, Measure Three of the RFA, GuadCo claimed the company had 53.8% female ownership.

The three subscription agreements attached to Part A of GuadCo's application were dated August 2, August 7, and August 8, 2019. The subscription agreements identified those pledging investment funds to GuadCo: Neal Pearlstine with a pledge of $600,000; Green Acres Investors LLC (Green Acres) with a pledge of $600,000; and Sheila Baldwin-Cohen with a pledge of $500,000. GuadCo was to receive a total of $1.7 million from the three

A-1472-21

subscribers.  By signing the subscription agreement, each investor agreed to be "legally bound by . . . the LLC Agreement."

On August 9, 2019, after the signing of the subscription agreements, GuadCo executed the LLC Agreement.  The LLC Agreement authorized GuadCo to issue 40,000 "Class A Common Units" (Common Units) and 17,500 "Series A Preferred Units" (Preferred Units).  Additionally, the LLC Agreement allowed the "Manager" to "authorize and issue additional units and additional classes of units."  The LLC Agreement defined the holder of one or more Common Units as a "Common Member," and the holder of one or more Preferred Units as a "Preferred Member."  The LLC agreement also defined "Member" as including Common and Preferred Members.

The LLC Agreement further provided:

> Each of the Members has contributed or will contribute cash to the capital of the LLC, in the amount set forth . . . in Exhibit A attached hereto ("Initial Contributions").  Each Member in exchange for such Member's Initial Contribution to the capital of the LLC shall receive the number of Units set forth opposite [its] name in Exhibit A.  . . .  A Member['s] . . . interest in the LLC shall be represented by the Unit or Units held by such Member . . . .  Two and one-half percent (2.5%) of the Initial Contribution has been paid with the execution and delivery of this Agreement.  Each Member shall pay the remainder of its Initial Contribution within fifteen (15) days of receipt of notice that the LLC has been awarded a Permit.

Exhibit A attached to the LLC Agreement identified the following Members of GuadCo: Joan Guadagnino (12,750 Common Units, 22.5% ownership); Dr. Victor Guadagnino (7,083.5 Common Units, 12.5% ownership); Victor Guadagnino, Jr. (7,083.5 Common Units, 12.5% ownership); Patricia Gregory (12,750 Common Units, 22.5% ownership); and "Investors" (17,000 Preferred Units, 30% ownership).[3]

Although Pearlstine, Green Acres, and Baldwin-Cohen signed the subscription agreements before the LLC Agreement's execution, Exhibit A attached to the LLC Agreement did not identify them by name. Instead, Exhibit A allocated 17,000 Preferred Units for the Member named "Investors." Nowhere in the LLC Agreement, Exhibit A attached to the LLC Agreement, nor the subscription agreements was the term "Investors" defined. Additionally, the LLC Agreement failed to establish the price or value for a Preferred Unit. Moreover, nothing in the subscription agreement, LLC Agreement, or Exhibit A to the LLC Agreement assigned any Preferred Units specifically to Baldwin-Cohen.

---

[3]  The LLC Agreement identified 17,500 Preferred Units. However, Exhibit A to the LLC Agreement allocated only 17,000 Preferred Units to the identified Members.

A-1472-21

Additionally, N.J.A.C. 17:30A-7.1(b)(2)(iv) required GuadCo to provide, in response to Part A, Question 20 of the RFA, "[a] list of all persons or business entities having five percent or more ownership." GuadCo identified the following individuals: Patricia Gregory; Joan Guadagnino; Victor Guadagnino Jr.; Dr. Victor Guadagnino Sr.; Sheila Baldwin-Cohen; and Neal Pearlstine. Despite Green Acres signing a subscription agreement and pledging $600,000 to the company, GuadCo did not identify Green Acres as an investor in response to Part A, Question 20 of the RFA.

In its response to the financing plan requirement under Criterion Three, Measure One of the RFA, GuadCo stated:

> Sheila Baldwin-Cohen . . . and several [other] investors have pledged to provide equity investment funds of $1,700,000 for the build out and operations of the Dispensary until stabilization. GuadCo2 LLC's operating agreement is submitted pursuant to Part A of this application . . . . See Attachment 2 (Subscription Agreements evidencing the financial commitments to [GuadCo].

In its response to Criterion Four, Measure One of the RFA regarding owners' ties to the local community, GuadCo stated "Sheila Baldwin-Cohen . . . owns 8.8% of [GuadCo]."

In its response to Criterion Seven, Measure Three of the RFA, GuadCo stated, "[a]t least [fifty-one percent] of the ownership of [GuadCo] will be held

by women," including an 8.8% ownership interest held by Sheila Baldwin-Cohen. GuadCo further stated: "In addition to the above ownership interest, several of our family and friends small investors will be women, each owning [one-quarter of one percent] to [one percent] of [GuadCo]; it is expected that at least an additional [five percent] of [GuadCo] will be women-owned in this fashion."

On November 18, 2021, well after the application deadline, GuadCo received a WBE certification from the Department of Treasury. GuadCo forwarded the certification to the CRC's executive director.

On December 7, 2021, GuadCo received a score of one out of a possible thirty points under Criterion Seven, Measure Three as a WBE. With a total score of 212 points, GuadCo failed to achieve a sufficiently high score to be awarded a dispensary permit for the Central region.

On December 10, 2021, GuadCo filed a formal grievance with the CRC. In the formal grievance, GuadCo claimed it "arbitrarily and unjustifiably received a score of [one] out of [thirty] for [the MBE/WBE Certification Measure,] despite being a 53.8% women-owned and women-operated company and having provided evidence of the same in [its] application . . . ."

11

In its January 14, 2022 response to GuadCo's grievance, the CRC noted scores were "based on the point in time of which the application was submitted and if a valid certification was awarded by the N[ew] J[ersey] Department of Treasury's Division of Revenue & Enterprise Services." The CRC referred to GuadCo's response to Part B of the application, indicating that GuadCo would proceed with the paperwork for a certification in the event it was awarded a dispensary permit. The CRC also directed GuadCo to its published scoring instructions and related documents to explain the scoring criteria.

GuadCo appealed the CRC's denial of its request for a dispensary permit. On appeal, GuadCo contends the CRC improperly scored its response to Criterion Seven, Measure Three, regarding the company's WBE status. Additionally, GuadCo asserts the CRC's scoring of other similarly-situated and differently-situated applicants and its denial of GuadCo's application for a dispensary permit were arbitrary, capricious, or unreasonable. We reject these arguments.

Our review of an agency decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). An administrative agency's final quasi-judicial decision "will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs.,

Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

When reviewing whether an agency decision is arbitrary, capricious, or unreasonable, we consider: (1) whether the agency action violated "express or implied legislative policies"; (2) whether there was substantial evidence in the record to support the agency's decision; and (3) whether in applying the law to the facts, the agency reached a conclusion "that could not reasonably have been made on a showing of the relevant factors." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)). If the agency satisfies these requirements, we "owe[] substantial deference to the agency's expertise and superior knowledge of a particular field." Herrmann, 192 N.J. at 28.

We may depart from such deference "when an agency's decision is manifestly mistaken." Outland v. Bd. of Trs. of the Tchrs' Pension & Annuity Fund, 326 N.J. Super. 395, 400 (App. Div. 1999). However, there is a "strong inclination" to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989). This presumption that an agency's decision is reasonable "is even stronger when the agency has delegated discretion to determine the

13

technical and special procedures to accomplish its task." In re Application of Holy Name Hosp. for a Certificate of Need, 301 N.J. Super. 282, 295 (App. Div. 1997). Our Legislature's delegation of power to an agency is "construed liberally when the agency is concerned with the protection of the health and welfare of the public." Barone v. Dep't of Hum. Servs., 210 N.J. Super. 276, 285 (App. Div. 1986).

We also defer to an agency's "technical expertise, its superior knowledge of its subject matter area, and its fact-finding role." Messick v. Bd. of Rev., 420 N.J. Super. 321, 325 (App. Div. 2011). Such deference "is only as compelling as is the expertise of the agency, and this generally only in technical matters which lie within its special competence." In re Application of Boardwalk Regency Corp. for a Casino License, 180 N.J. Super. 324, 333 (App. Div. 1981).

The CRC, as the successor agency to the Department of Health for issuance of medicinal cannabis permits, has the discretion to decide "whether the issuance of a permit to a particular applicant would be consistent with the purposes of [N.J.S.A. 24:6I-1 to -16]," and to determine "the kind and amount of information necessary to process permit applications." Nat. Med., Inc. v. N.J. Dep't of Health & Senior Servs., 428 N.J. Super. 259, 263 (App. Div. 2012).

14

We first address GuadCo's argument that the CRC's failure to award at least a partial credit score of twenty-five points under Criterion Seven, Measure Three was arbitrary, capricious, and unreasonable. GuadCo argues the LLC Agreement and Baldwin-Cohen's subscription agreement demonstrated its satisfaction of the requirements for a WBE certification. We disagree.

N.J.A.C. 17:30A-6.4(a) provides: "The [CRC] . . . shall evaluate and score each application based on the quality of the applicant's submission, and its conformity to the notice of [RFAs] published in the New Jersey Register." Under the governing regulations, an applicant could earn partial credit by presenting evidence they would meet the WBE certification requirements upon generating revenue.

In the scoring instructions for Criterion Seven, Measure Three, Reviewer Three was instructed to award the full thirty points only to applicants who provided the required certification from the Department of Treasury. The scoring instructions stated:

> If the applicant fails to supply a certification because they are a brand[-]new entity with no revenue, but supplies evidence they may meet the criteria once generating revenue, the scorer can [give] partial credit (up to 25 pts) based on the strength of the evidence provided. A score of 0 [] should only be given to applicants with no certification and that submitted no evidence supporting their ability to qualify in the

future, or their involvement of minorities, women[,] or veterans in their leadership. In lieu of a certification, scorers should consult Part A, Question 20 when assessing this measure. Individuals not listed on Part A, Question 20 should not be considered in the evaluation of this measure.[4]

GuadCo claims reading the LLC Agreement and Baldwin-Cohen's subscription agreement together demonstrated GuadCo had more than fifty percent ownership allocated to women. GuadCo asserts that if Reviewer Three had considered its entire application and performed a simple mathematical calculation, they would have concluded GuadCo satisfied the MBE/WBE portion of the RFA to be awarded the full thirty points or, at a minimum, a partial credit score of twenty-five points. Further, GuadCo contends that had it been awarded at least twenty-five points under Criterion Seven, Measure Three, it would have received a dispensary permit for the Central region. We disagree.

Assuming, for the sake of argument, GuadCo divided the 17,000 Preferred Units identified in Exhibit A attached to its LLC Agreement among the three subscription agreement investors proportional to their investments, GuadCo had the following ownership: Patricia Gregory (22.5%); Joan Guadagnino (22.5%);

---

[4] Part A, Question 20 requested the names, birthdates, addresses, positions, and pay/compensation of all owners, principals, partners, investors, members, board members, directors, trustees, and officers.

16

Dr. Victor Guadagnino, Sr. (12.5%); Victor Guadagnino, Jr. (12.5%); Sheila Baldwin-Cohen (8.8%); Neal Pearlstine (10.6%); and Green Acres (10.6%). To acquire additional female investors, as suggested in GuadCo's response to Criterion Seven, Measure Three of the RFA, presumably GuadCo would need to issue additional units, thereby diluting the ownership interest of existing unit owners or, alternatively, purchase shares from existing unit owners such as Baldwin-Cohen. Therefore, reading the entirety of GuadCo's responses to the RFA, including the attachments, GuadCo's suggested simple arithmetic for calculating the percentage female ownership is flawed.

Furthermore, the CRC's scoring instructions provided "[i]ndividuals not listed on Part A, Question 20 should not be considered in the evaluation of [Criterion Seven, Measure Three]." GuadCo did not list Green Acres as an investor in its answer to Part A, Question 20; however, GuadCo provided a copy of Green Acres's subscription agreement identifying it among the "Investors" under Exhibit A to the LLC Agreement.

Presuming GuadCo divided the issue number of Preferred Units among the three subscription agreement investors proportionally to their investments, Reviewer Three would be unable to calculate Baldwin-Cohen's true ownership interest based on GuadCo's response to Part A, Question 20, submission of

17

Exhibit A attached to the LLC Agreement, and inclusion of the three subscription agreements submitted by GuadCo with its application.

Moreover, GuadCo provided no evidence the 17,000 Preferred Units would be distributed among the three subscription agreement investors in proportion to their investments. Despite the dating of the three subscription agreements prior to the execution of the LLC Agreement, GuadCo never named Pearlstine, Green Acres, or Baldwin-Cohen in the LLC Agreement or Exhibit A to the LLC Agreement.

Based on the foregoing information, a review of GuadCo's application revealed inconsistent or contradictory information, including the following: (1) GuadCo distributed the 17,000 Preferred Units to Pearlstine, Green Acres, and Baldwin-Cohen proportional to their investments under the subscription agreements; (2) GuadCo distributed the 17,000 Preferred Units to Pearlstine and Baldwin-Cohen, but not Green Acres, proportional to their investments under the subscription agreements; (3) GuadCo distributed the 17,000 Preferred Units to Pearlstine, Green Acres, and Baldwin-Cohen proportional to their investments per the subscription agreements but anticipated diluting the ownership of the existing investors; or (4) GuadCo reserved the 17,000 Preferred Units for an undefined class of "Investors," potentially including Pearlstine,

18

Green Acres, and Baldwin-Cohen, which it intended to distribute in some undefined manner in the future.

If GuadCo is asserting the first scenario, distribution of the 17,000 Preferred Units to Pearlstine, Green Acres, and Baldwin-Cohen proportional to their investments under the subscription agreements, such an assertion is unsupported by the LLC Agreement, Exhibit A to the LLC Agreement, or GuadCo's response to Part A, Question 20.

If GuadCo is asserting the second scenario, its claim could be supported by Exhibit A to the LLC Agreement coupled with GuadCo's response to Part A, Question 20. However, there is no evidence GuadCo distributed the 17,000 Preferred Units solely to Pearlstine and Baldwin-Cohen.

If GuadCo is asserting the third scenario, its claim could be supported by its response to Criterion Seven, Measure Three. However, such an assertion lacks the required evidentiary support identified with the second scenario.

If GuadCo is asserting the fourth scenario, reservation of 17,000 Preferred Units for an undefined class of "Investors," to be distributed in some undefined manner at some undetermined time, GuadCo's documents and responses to the RFA could support such a conclusion. However, nothing in the LLC Agreement, Exhibit A attached to the LLC Agreement, or the subscription agreements

19

identified the "Investors." Nor do GuadCo's corporate formation documents provide for the allocation of units amount the "Investors." Further, the LLC Agreement suggests there will be other investors, holding between .25% and 1% of the company, without stating whether additional units will be issued or reallocated among the undefined "Investors."

Here, GuadCo failed to provide clear and unambiguous proof that it had more than fifty percent women ownership such that it would qualify for a WBE certification once it became a "going concern," generating revenue as required by N.J.A.C. 17:46-1.3(d). GuadCo's responses to different sections of the RFA were inconsistent as to the ownership interest of the "Investors." Thus, on this record, we are satisfied the CRC decision to award only one point of partial credit to GuadCo under Criterion Seven, Measure Three was not arbitrary, capricious, or unreasonable.

Because we are satisfied that the partial credit award of one point in response to Criterion Seven, Measure Three was appropriate based on the information GuadCo submitted with its application, we need not address GuadCo's arguments concerning the partial credit scores awarded to other applicants. Each applicant received a score based on the information, or lack thereof, in response to each measure. We decline to second-guess the scoring

20

awarded to other applicants, particularly because the record lacks complete copies of the other RFA submissions for dispensary permits in the Central region which received partial credit scores of twenty-five points or a full score of thirty points.

We next consider GuadCo's argument that the CRC's decision lacks support in the record based on substantial evidence. We disagree.

An agency "must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination"; however, "[a]ll of the evidential data [before it] need not be repeated or even summarized, nor need every contention be exhaustively treated." In re Howard Sav. Inst. of Newark, 32 N.J. 29, 52, 53 (1960). An agency decision "is sufficient if it can be determined . . . without question or doubt what facts and factors led to the ultimate conclusions reached." Id. at 53.

Here, the CRC's decision was supported by sufficient credible evidence, specifically GuadCo's internally inconsistent responses in its application for a dispensary permit. The CRC advised that applicants ineligible for a Department of Treasury WBE certification would receive only a partial credit score. The CRC also verified the scoring provided by Reviewer Three, and found their scoring consistent with the CRC's scoring instructions. Additionally, the CRC

21

provided detailed information explaining its decision, including its November 10, 2021 memorandum and its January 14, 2022 response to GuadCo's grievance. Having reviewed the record, we are satisfied there was substantial evidence to support awarding GuadCo a partial credit score of one under Criterion Seven, Measure Three. Thus, the CRC's denial of GuadCo's application was not arbitrary, capricious, or unreasonable.

Any remaining arguments raised by GuadCo lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION