**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1465-21

IN THE MATTER OF THE
DENIAL OF DISPENSARY
PERMIT ENDORSEMENT FOR
SPECTRYM CONSULTING
GROUP, LLC, TO OPERATE AN
ALTERNATIVE TREATMENT
CENTER PURSUANT TO THE
2019 REQUEST FOR
APPLICATION PROCESS.

_____

Submitted November 8, 2023 – Decided December 20, 2023

Before Judges Whipple, Mayer and Enright.

On appeal from the Cannabis Regulatory Commission.

Pashman Stein Walder Hayden, attorneys for appellant Spectrym Consulting Group, LLC (Gregg Howard Hilzer and Janie Byalik, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent Cannabis Regulatory Commission (Melissa H. Raksa, Assistant Attorney General, of counsel; Jacqueline R. D'Alessandro, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Spectrym Consulting Group, LLC (Spectrym), (d/b/a The Helix Center), appeals from a December 7, 2021 final agency decision issued by respondent New Jersey Cannabis Regulatory Commission (CRC), denying its application for a medicinal marijuana dispensary permit to operate an Alternative Treatment Center (ATC). We affirm.

I.

We incorporate the background regarding the CRC's issuance of dispensary permits to operate ATCs set forth in the back-to-back companion cannabis permit cases presented to the panel on October 11, 2023. See I/M/O Denial of the Dispensary Permit Endorsement for AP NJ Health, LLC, No. A-0783-21, A-0943-21, A-1326-21 (App. Div. Dec. 8, 2023) (slip op. at 2).[1] In our consolidated opinion on these back-to-back cannabis permit cases, we described, in detail, the process adopted by the CRC for reviewing permit applications to operate ATCs.

---

[1] While Rule 1:36-3 generally precludes reference to unpublished opinions, we may refer to an unpublished decision for case history. See Animal Prot. League of N.J. v. N.J. Dep't of Env't Prot., 423 N.J. Super. 549, 556 n.2 (App. Div. 2011) (citing Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2011)).

Briefly, the Compassionate Use of Medical Cannabis Act, N.J.S.A. 24:6I-1 to -56 (the Act), provides qualifying patients and their caregivers with protection from arrest, prosecution, and other penalties for possessing cannabis for medical purposes. N.J.S.A. 24:6I-2(e).[2] The Act also protects those authorized to produce, process, and dispense marijuana pursuant to the statute's terms. N.J.S.A. 24:6I-7. Initially, the Act charged the Department of Health (DOH) with implementing New Jersey's Medical Cannabis Program (MCP). This included creating a registry of qualified patients and issuing permits for the operation of ATCs. N.J.S.A. 24:6I-4; N.J.S.A. 24:6I-7.1. The CRC has since assumed management of the MCP. N.J.S.A. 24:6I-24(a).

N.J.S.A. 24:6I-7(h)(3) requires that the CRC "seek to ensure the availability of a sufficient number of [ATCs] throughout the State, pursuant to need." The CRC promulgated regulations, N.J.A.C. 17:30A-1.1 to -13.11, providing the framework through which it issues Requests for Applications (RFAs) for the operation of ATCs.

---

[2] All citations to the Act are to its current amended form, L. 2021, c. 252.

The Act was amended effective July 2, 2019,[3] and now allows the CRC to issue separate permits for entities to operate as medical cannabis cultivators, manufacturers, or dispensers. N.J.S.A. 24:6I-7(a)(1); N.J.A.C. 8:64-7.1(e). The new N.J.S.A. 24:6I-7.2(c), (d), and (e) set forth detailed lists of criteria the CRC must use in evaluating applications for each type of permit.

On July 1, 2019, the DOH issued an RFA, seeking applicants for the new types of permits that would soon be available: five cultivation endorsements,[4] fifteen dispensary endorsements,[5] and four vertically integrated (VI)[6] endorsements. The RFA contemplated one VI, two cultivation, and five dispensary endorsements each for the northern and central regions of the State, and one VI, one cultivation, and five dispensary endorsements for the southern

---

[3]  See L. 2019, c. 153. Because the RFA was issued one day prior to the amendments' effective date, it is governed by the prior iteration of the Act.

[4]  These endorsements are the functional equivalent of permits. Thus, the terms were used interchangeably in the RFA.

[5]  The CRC subsequently doubled the dispensary awards issued under the 2019 RFA from fifteen to thirty "to keep pace with expanding patient enrollment."

[6]  VI endorsements allow an entity to grow, process, and sell marijuana as part of the State's MCP.

A-1465-21

region. The DOH received 198 applications for the various types of endorsements, including 109 applications for dispensary permit endorsements.

The 2019 RFA described the application. Part A, titled "Mandatory Information," included the applicant entity's organizational documents; evidence of good standing with the Department of the Treasury; information about principal officers, directors, owners, and board members; verification of the approval of the municipality where the ATC would be located; evidence of ownership or lease of the proposed site; and evidence of compliance with local laws.

Part B consisted of the "Scored Criteria" upon which applicants would be judged. These criteria asked applicants to describe their proposed operations, experience, security and quality control plans, financing, and other aspects of running an ATC. Applicants were directed to file a PDF or printed document of not more than 100 pages for each endorsement they sought for Part B.

Once received, the DOH would "review [all applications] for completeness and truthfulness" to determine "whether an applicant passe[d] or fail[ed] a particular requirement in the mandatory section." If the DOH deemed an application complete, its Part B would then be "reviewed and scored by a selection committee" comprised of nine employees from the DOH, the

Department of the Treasury, the Department of Environmental Protection, and the Department of Labor.

In September 2019, the selection committee members attended a training, which included instruction on how they were to review applications. They also were given detailed instructions for scoring each criterion and measure. The instructions informed reviewers what to consider when evaluating applications and when it was appropriate to give a score of zero, the maximum possible points, or any score in between.

To complete scoring of the applicants' Part B submissions, the CRC divided the nine selection committee members into three teams of three, based on their expertise, and assigned each team to review a specific group of criteria and measures for which that expertise was relevant. Team One, which consisted of Reviewers 2, 5, and 6, had experience in quality assurance, public health, emergency preparedness, pharmaceutical assistance, fiscal management, public affairs, and the management of environmental resources. This team reviewed Criteria 1 through 5, which involved an applicant's "[a]bility to meet the overall health needs of qualified patients and safety of the public"; "[h]istory of compliance with regulations and policies governing government-regulated marijuana programs"; "[a]bility and experience . . . in ensuring an adequate

6

supply of marijuana"; "[c]ommunity [s]upport and [p]articipation"; and "[a]bility to provide appropriate research data."

Team Two, consisting of Reviewers 1, 8, and 9, had experience with "regulation of the cultivation, manufacturing and dispensing of medicinal cannabis." These members reviewed Criterion 6, which considered an applicant's "[e]xperience in cultivating, manufacturing, or dispensing marijuana in compliance with government-regulated marijuana programs." For Teams One and Two, an average was taken of the three reviewers' scores to create an applicant's total score for each team's portion of the application.

Team Three reviewed Criterion 7, which comprised four measures: Labor Peace Agreement (LPA) ("to ensure the cultivation, manufacturing[,] and dispensing of medical cannabis will not be disrupted by labor-related disputes"); Labor Compliance Plan; business development and minority-owned (MBE), woman-owned (WBE), and veteran-owned business (VOB) certifications; and workforce development. Reviewer 4, who had expertise in labor compliance, scored Criterion 7, Measures 1 and 2. Reviewer 3, who had experience with business development and MBE, WBE, and VOB business certifications, scored Criterion 7, Measure 3. Finally, Reviewer 7, who had experience with workforce development, scored Criterion 7, Measure 4. Scores for this last set

of measures were added together to create the total score for Team Three for each application. Then, the scores for the three teams were added together, generating the final composite score.

Once all the committee members completed their review, their scores were compiled into a "master spreadsheet." The entry of the reviewers' individual measure scores was "checked at least twice and validated against each scorer's scoresheet[s]" to ensure against mistakes. Because the CRC had assumed control of the MCP by this point, its staff conducted a quality control review and audit.

For its statistical audit, CRC staff "conducted a thorough statistical analysis of each reviewer's scores, each team's composite scores, and the final composite scores," "analyzed the distribution around the mean of the three teams' scores," and "searched for any outliers in the final total scores." Only two measure scores were found to be statistical outliers, and these were "confirmed as validly and properly assigned." The analysis further revealed, although there was "some variation between scorers on the same teams, . . . each scorer was consistent with the distribution of their scores across the whole pool of applications." Stated differently, while one reviewer on a team may have

8

awarded lower scores than the others, these scores were consistently lower, rather than showing great internal differences between the best and worst.

On November 10, 2021, the CRC issued a memorandum entitled "General Responses to Debrief Questions," explaining the scoring process. The memorandum also noted the selection committee was divided into teams to take advantage of members' differing expertise and "so that no one selection committee reviewer had control over an application's overall score."

Additionally, the memorandum addressed questions posed by applicants about the scoring of certain criteria and measures. For example, on Criterion 7, Measure 3 (MBE, WBE, or VOB certification), the memorandum advised that applicants providing a Department of Treasury certification received the full thirty points allotted for this measure. In the absence of a Department of Treasury certification, a partial credit score up to twenty-five points was awarded if the applicant provided evidence that it would otherwise meet the MBE, WBE, or VOB certification requirements "once generating revenue." However, a score of zero was to be given on this measure "to applicants with no certification and that submitted no evidence supporting their ability to qualify in the future, or their involvement of minorities, women, or veterans in their leadership." The memorandum also stated, "[l]ike the scores of other reviewers,

Reviewer 3's scores were analyzed for statistical consistency and reviewed for compliance with scoring instructions and the RFA instructions." Further, Reviewer 3's "scores were found to be consistent across applicants, consistent with the scoring instructions and RFA instructions, and reflective of the reviewer utilizing their unique expertise to evaluate the information submitted by applicants."

Because reviewers worked independently and did not discuss their scores, there was some variation among scores given to applicants by different reviewers on the same measures. The November 10 memorandum discussed the quality control review and audit CRC staff performed to ensure that any such variance "was the result of an intentional, reasonable review of an application and not the result of a misunderstanding of the scoring instructions, or an inconsistent approach by a reviewer." Moreover, the memorandum stated, "[d]isagreement among reviewers on the relative merits on a response 'd[id] not mean the scores [we]re inherently wrong or improperly delivered.'"

On December 7, 2021, the CRC awarded thirty dispensary permits to those applicants with the highest scores. Out of a possible score of 300 points, the scores for the dispensary permit applicants "ranged from 273.33 points to 103.67 points." The ten applicants who were awarded dispensary permits for the

southern region had scores ranging from 266.33 to 205. Spectrym received a composite score of 156, the fourth lowest score overall. Accordingly, the CRC denied Spectrym's application for a dispensary permit.

Spectrym timely submitted a grievance to the CRC, expressing concern about the denial of its application, and asking, in part, that the CRC provide Spectrym with "a breakdown of each category's points" so Spectrym could "see how [it] was scored and see how the approved dispensaries were scored."

On January 14, 2022, the CRC emailed a response to Spectrym's grievance and stated to the extent a question or grievance was "addressed in other materials previously provided to the public by the CRC, those materials [we]re referenced and cited" in the CRC's January 14 email "to direct [Spectrym] to the appropriate documents where [its] concern ha[d] been addressed." The CRC specifically referred Spectrym to its "recommendation report packet and supporting documents, including the scoring criterion at https://www.njgov/cannabis/businesses/medicinal/." Additionally, the CRC addressed Spectrym's grievance that it should have been awarded thirty points on Criterion 7, Measure 1 based on Spectrym's submission of an LPA with its application, stating a review of Spectrym's application revealed that "a letter of support was provided with reference to a neutrality agreement, [but] no actual

11

[LPA] was submitted for review" for Criterion 7, Measure 1, "resulting in the score provided by the reviewers."

## II.

On appeal, Spectrym contends "the CRC erred in denying Spectrym a license to operate a medicinal marijuana [ATC] because the scoring of its application was arbitrary and capricious." Additionally, it argues "Spectrym's composite scores . . . for Criteri[a] 1 Through 6 are unreliable" and "fatally suffer from an extraordinarily high error rate." Further, Spectrym contends "the Reviewers improperly failed to comply with the RFA in evaluating Criterion 7, thereby depriving Spectrym of a substantial amount of points." In that vein, it argues "Reviewer 7 improperly failed to credit the [LPA] that Spectrym submitted, resulting in a wrongful denial of [thirty] points" and "Reviewer 3 improperly awarded [zero] points for Criterion 7[,] Measure [3[7]] regarding [MBE, WBE,] or [VOB] certification." Finally, Spectrym contends "the CRC failed to disclose the basis for its decision." These arguments are unavailing.

Our review of an agency decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). An administrative agency's final quasi-judicial decision "will be sustained unless there is a clear showing that it is arbitrary, capricious, or

---

[7] Spectrym mistakenly refers to this Measure as "Measure 4."

unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

When reviewing whether an agency decision is arbitrary, capricious, or unreasonable, we consider: (1) whether the agency action violated "express or implied legislative policies"; (2) whether there was substantial evidence in the record to support the agency's decision; and (3) whether in applying the law to the facts, the agency reached a conclusion "that could not reasonably have been made on a showing of the relevant factors." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)). If the agency satisfies these requirements, we "owe[] substantial deference to the agency's expertise and superior knowledge of a particular field." Herrmann, 192 N.J. at 28.

We may depart from such deference "when an agency's decision is manifestly mistaken." Outland v. Bd. of Trs. of the Tchr.s' Pension & Annuity Fund, 326 N.J. Super. 395, 400 (App. Div. 1999). However, there is a "strong inclination" to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989). This preference "is even stronger when the agency has

13

delegated discretion to determine the technical and special procedures to accomplish its task." In re Application of Holy Name Hosp. for a Certificate of Need, 301 N.J. Super. 282, 295 (App. Div. 1997). Our Legislature's delegation of power to an agency is "construed liberally when the agency is concerned with the protection of the health and welfare of the public." Barone v. Dep't of Hum. Servs., 210 N.J. Super. 276, 285 (App. Div. 1986). Accordingly, "[t]he burden is on the party challenging the validity of an agency's decision to demonstrate that the action was arbitrary, capricious[,] or contrary to a legislative purpose." In re Application of Holy Name Hosp., 301 N.J. Super. at 295.

We also "defer to an agency's technical expertise, its superior knowledge of its subject matter area, and its fact-finding role." Messick v. Bd. of Rev., 420 N.J. Super. 321, 325 (App. Div. 2011). Such deference "is only as compelling as is the expertise of the agency, and this generally only in technical matters which lie within its special competence." In re Application of Boardwalk Regency Corp. for a Casino License, 180 N.J. Super. 324, 333 (App. Div. 1981). Pertinent to this appeal, the CRC, as the successor agency to the DOH, has the discretion to decide "whether the issuance of a permit to a particular applicant would be consistent with the purposes of [N.J.S.A. 24:6I-1 to -16]," and to determine "the kind and amount of information necessary to process permit

applications." Nat. Med., Inc. v. N.J. Dep't of Health & Senior Servs., 428 N.J. Super. 259, 263 (App. Div. 2012).

An administrative agency should "articulate the standards and principles that govern [its] discretionary decisions in as much detail as possible." Van Holten Grp. v. Elizabethtown Water Co., 121 N.J. 48, 67 (1990) (quoting Crema v. N.J. Dept. of Env't Prot., 94 N.J. 286, 301 (1983)). An agency must make findings "to the extent required by statute or regulation[] and provide notice of those [findings] to all interested parties." In re Issuance of a Permit by Dep't of Env't Prot. to Ciba-Geigy Corp., 120 N.J. 164, 173 (1990). However, "[a]ll of the evidential data" submitted to an agency "need not be repeated or even summarized, nor need every contention be exhaustively treated." In re Application of Howard Sav. Inst. of Newark, 32 N.J. 29, 53 (1960). A decision "is sufficient if it can be determined from the document without question or doubt what facts and factors led to the ultimate conclusions reached." Ibid. Even where an agency's findings are not as "full and well organized" as they could be, if we are able to understand the meaning of, and the reasons for, the decision, there is no reason for a remand. Ibid.

Mindful of these well-established principles, we turn to the facts of this case, recognizing Spectrym does not dispute it had the fourth lowest score

overall among all applicants seeking a dispensary permit. However, it relies on our decision in In re Application for Medicinal Marijuana Alternative Treatment Center for Pangaea Health and Wellness, LLC, 465 N.J. Super. 343 (App. Div. 2020), to assert the CRC tolerated too great a level of "relative error"[8] in the scoring process, leading to an outcome that was arbitrary and capricious. This argument fails.

The record in this matter is far different from that in Pangaea. In Pangaea, the DOH only provided applicants with scores without any "why and wherefore" to support its selections. Id. at 375. But here, the CRC thoroughly explained its scoring and quality control processes, both in its November 10, 2021 General Responses to Debrief Questions and its December 7, 2021 memorandum to all 2019 RFA applicants. Further, the CRC provided detailed information to the applicants about the expertise of each member of the selection committee.

Additionally, the CRC did more than check the selection committee's mathematics and the accuracy of the data entry in its score spreadsheets. Its staff: "search[ed] for odd or outlying scores that could unfairly skew the

---

[8] Relative error is a statistical concept that here, measures the difference between scores given on the same measure by different reviewers. Low relative error would mean that all reviewers gave the same or similar scores, while 100% relative error would mean that one reviewer gave a perfect score, and another gave a zero. Pangaea, 465 N.J. Super. at 364.

results," id. at 381; checked the scores given against the RFA and scoring instructions to ensure reviewers complied with both; and performed a statistical analysis. Thus, the CRC took many steps to improve its scoring process for the 2019 RFA, compared to the deficient procedures we criticized in Pangaea. It also responded directly to Spectrym's questions and grievances in its January 14, 2022 letter. Therefore, we reject Spectrym's contention that the CRC's scoring of Spectrym's application was arbitrary and capricious or that the CRC "failed to disclose the basis for its decision."

Next, Spectrym argues the scores it received on Criteria 1 through 6, as well as Criterion 7, Measures 3 and 4, were erroneous or unreliable. We are not convinced.

Although it is unnecessary to address each criterion and measure Spectrym contests, we discuss some of the criteria and related measures at issue to provide context for our opinion. As already noted, Teams One and Two reviewed Criteria 1 through 6. Spectrym argues Team One should have given Spectrym a higher score under Criterion 1, Measure 1, which instructed Spectrym to "provide an acceptable safety and security plan, including [a] staffing and site plan, and a detailed description of proposed security and safety measures, which demonstrates compliance with the rules at N.J.A.C. 8.64."

According to the CRC, "Spectrym's security plan [wa]s unquestionably robust and well-designed, and its narrative answer to this prompt [wa]s largely responsive." However, Spectrym's response did "not discuss its staffing plan," so it received a composite score of 8.33/10 points. We discern no error in this regard.

Spectrym also contends it deserved a higher score under Criterion 1, Measure 2, which directed applicants to "provide a plan explaining how the proposed ATC would minimize negative environmental impacts." Spectrym argues Reviewer 2 unjustifiably awarded it one point on this Measure.

As the CRC noted in its November 10, 2021 General Responses to Debrief Questions, "[s]everal applicants inquired about perceived discrepancies regarding Reviewer 2, who provided lower scores than the other two reviewers on Team [One]." However, the CRC also determined Reviewer 2 was "consistently a more conservative scorer than Reviewers 5 and 6. . . . and the variation resulting from lower scores from Reviewer 2 [wa]s simply reflective of that reviewer's reasonable evaluation of each applicant's submitted documentation." Moreover, the CRC found "a statistical analysis of all three [r]eviewers" on Team One "show[ed] a consistent distribution of scores and . . . that all three reviewers scored in a statistically consistent manner."

Therefore, Reviewer 2's comparatively lower score on Criterion 1, Measure 2, in and of itself, does not lead to a conclusion that Spectrym's composite score on this measure was arbitrary or capricious. We also note that on Criterion 1, Measure 2, the CRC found "Spectrym's environmental impact plan discusse[d] disposal of cannabis products via secure transport back to the 'origin of purchase,'" but it did "not discuss the energy needs it expect[ed] to have, or how it w[ould] mitigate the negative impacts of those energy needs." Accordingly, we cannot conclude Spectrym's composite score of 5.67/10 on Criterion 1, Measure 2 was arbitrary or capricious.

Likewise, considering the CRC's thorough analysis of Reviewer 2's overall scores, and its ultimate conclusion Reviewer 2 provided a "reasonable evaluation of each applicant's submitted documentation," we are not satisfied we should disturb the scores Spectrym received on Criterion 2, Measure 1 (background of principals, board members, and owners) or Criterion 3, Measure 1 (financing plan), despite the fact Reviewer 2 gave Spectrym comparatively lower scores than Reviewers 5 and 6 on these criteria and measures.

Here, the record reflects that on Criterion 2, Measure 1, the CRC determined two of the individuals Spectrym listed in its application were "merely 'potential' advisory board members" and the "'security film and camera

business' professional" Spectrym mentioned had no "experience working in regulated industries." Further, as to Criterion 3, Measure 1, the CRC found Spectrym did "not provide any proof of funds for capital it allegedly had on hand . . . at the time[,] nor the source or proof of committed funds for the additional $1.5 million it claim[ed] it would be funded with if approved for a permit." Thus, we are not persuaded Spectrym's composite scores of 16.33/20 and 12.76/20 points, respectively, on Criterion 2, Measure 1, and Criterion 3, Measure 1, were awarded in error.

Similarly, we reject Spectrym's argument that Reviewers 7 and 3 improperly awarded it zero points on Criterion 7, Measures 1 and 3, respectively. Regarding Criterion 7, Measure 1, applicants were asked to "provide a signed [LPA] that include[d] provisions to ensure the cultivation, manufacturing[,] and dispensing of medical cannabis w[ould] not be disrupted by labor-related disputes." The instructions also stated "[f]ailure to provide a signed agreement w[ould] result in a score of [zero] for this measure." Spectrym admits it committed "a formatting error," and "attached [a] cover letter to the [LPA] directly after its response to Criteri[on] 7, Measure 1," rather than the LPA itself. Still, it contends it should have been awarded thirty points on this measure because it provided a signed LPA elsewhere in its application.

20

The CRC counters that Spectrym attached its LPA "to a wholly distinct measure" and no reviewer was "required to presume that Spectrym meant for an agreement included elsewhere in its application to also be considered responsive to [Criterion 7,] Measure . . . 1." We are satisfied the CRC has the better argument.

Next, applicants addressing Criterion 7, Measure 3 were instructed to "provide a copy of certification(s) issued by the Department of the Treasury, Division of Revenue which verifies MBE/WBE certification or VOB certification, or evidence that the applicant would otherwise meet the MBE/WBE certification or VOB certification requirements once generating revenue." Applicants submitting "evidence of meeting the criteria in the future . . . receive[d] partial credit, based on the strength of the evidence." But, as we mentioned, a score of zero was to be given "to applicants with no certification and that submitted no evidence supporting their ability to qualify in the future, or their involvement of minorities, women[,] or veterans in their leadership."

Although Spectrym concedes it was not entitled to thirty points on Criterion 7, Measure 3 because it "is not a minority or women[-]owned business," it argues it was "entitled to partial credit for this Measure" because

its application reflected it "currently ha[s] a woman . . . on [its] advisory board" and it "intend[ed] to 'expand on the number of minorities and/or additional women on [its] [a]dvisory [b]oard.'"  But considering Spectrym provided no certification nor evidence to support its ability to qualify for a certification in the future, as the CRC points out, we discern no basis to second-guess the score of zero points on this criterion and measure.

In sum, Spectrym has not established the CRC's decision to deny Spectrym's application for a medicinal marijuana dispensary permit to operate an ATC was arbitrary, capricious, or unreasonable.  Thus, we have no reason to disturb the December 7, 2021 final agency decision.

Any remaining arguments raised by Spectrym lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1465-21